**STATE of Tennessee, Appellee,**

v.

**Jimmy L. DESIREY, Appellant.**

Court of Criminal Appeals of Tennessee, at Nashville.

April 5, 1995.

Permission to Appeal Denied by Supreme Court Aug. 28, 1995.

Peter J. Strianse, Nashville, for the Appellant.

Charles W. Burson, Attorney General of Tennessee and John B. Nisbet, III, Assistant Attorney General of Tennessee, Nashville, Victor S. Johnson, III, District Attorney General and John Zimmerman, Roe Ellen Coleman, Assistant District Attorneys General, Nashville, for the Appellee.

## OPINION

TIPTON, Judge.

The defendant, Jimmy L. Desirey, was convicted by a jury in the Davidson County Criminal Court on four counts of bribing a public servant, a Class C felony. He was sentenced as a Range I, standard offender to four consecutive four-year, six-month sentences for an effective sentence of eighteen years. He received fines totalling $20,000. In this appeal as of right, the defendant presents the following issues for review:

(1) Whether the defendant's convictions should be vacated pursuant to *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), because a state prosecutor was exposed to immunized in-

formation concerning the defendant's prior gambling stamp and wagering tax returns.

(2) Whether the trial court erred in failing to consolidate the four counts of bribery of a public servant.

(3) Whether the trial court erred in ordering the defendant to serve consecutive sentences.

The defendant was originally indicted on one count of conspiracy to engage in aggravated gambling promotion, four counts of bribing a public servant, one count of bribing a witness, and forty counts of aggravated gambling promotion. During the trial, the trial court dismissed the count of bribing a witness and thirty-four counts of aggravated gambling. The jury acquitted the defendant of the conspiracy and remaining aggravated gambling promotion charges, but convicted him on the remaining bribery counts.

At trial, Metro Police Department Officers Terry Watts, Rick Laymance, and Sergeant David Elmore testified that on numerous occasions they had raided Eastside Market, located at 709 to 713 North First Street, because it had been known as a "numbers house" that involved illegal gambling. Specifically, the officers focused their testimony on a series of raids that began on November 13, 1990, and continued for two consecutive nights and a fourth night. Cash amounts of $486.83, $102.22, $298.34 and $45.00 were seized.

During the fourth raid, a door to the back side of the market was damaged when the officers used forced entry. The following day, Officer Laymance and Officer Jeff Livers, while riding on patrol, noticed that several people were standing around the back of the market and one individual was putting up a new door. The officers conducted a field interview to determine who ran the business and Officer Laymance later testified that it had been on this date that he had first met the defendant, who was standing behind a black pickup truck watching the repairs being made.

Officer Laymance spoke with the defendant and heated words were exchanged. The defendant told the officers that they "didn't know who [they] were messing with,"

and then turned to Officer Livers and said something about "meet[ing] halfway." As the conversation became more subdued, the defendant openly stated that he needed some relief and asked what he could do to meet the officers halfway.

After leaving the market, Officer Laymance immediately contacted his superior, Sergeant Jolley, and advised him of the bribery attempt. The sergeant told Laymance to make sure he carried a pocket recorder for recording any future conversations with the defendant.

The following day, Officer Laymance was dispatched to a Mrs. Winner's restaurant located on North First Street, about one block from Eastside Market. A person known to Laymance as "Big Mike" approached him while he was in the restaurant and informed him that the defendant would like to talk to him about the market. Officer Laymance contacted Sergeant Jolley who, in turn, contacted Lieutenant Jim Blackmore. The decision was made to inform Police Chief Kirchner and Assistant District Attorney General John Zimmerman of the bribery attempt and to seek their assistance in the investigation. It was decided that Officer Laymance would be equipped to tape-record a meeting with the defendant.

The first of a series of four relatively lengthy conversations between Officer Laymance and the defendant occurred on November 20, 1990. After discussing past raids and the defendant's status on a federal indictment, the parties engaged in the following conversation:

LAYMANCE: You know, I guess the bottom line is, if you're asking if I'd take something, I probably would, but then again, that's gonna be between me and you.

\* \* \* \* \* \*

LAYMANCE: Well, tell me what you want. We'll see if we can work it out.

DESIREY: Well, all I, like I just told you, I, just a little relief. I'm not asking you to leave us alone. I mean, I want the alley cleaned out. I mean, I'm gonna keep that son of a bitch [the numbers house] if I have to end up running them [loiterers]

off, run em all off, I might run the business off doing it. But I mean, I don't know. You tell me what it'll take. I mean, I know you. You're in an awkward position. I realize that, just like I'm in, I mean. Is a couple of hundred dollars a week fair?

LAYMANCE: I think that'll work.

Officer Laymance and the defendant then arranged for weekly money pick-ups at the defendant's son's used car lot. As Laymance started to leave, the defendant gave him a piece of paper with the phone number of the market on it. Two $100.00 bills were folded inside the paper.

The second taped conversation took place exactly one week later. At this meeting the defendant stated that in the past he had managed "thirty-five numbers operations at one time." As he explained the procedure for picking up tickets and running routes, the following conversation was recorded:

LAYMANCE: But you had to go through each one of them tickets.

DESIREY: Every f----- ticket at 35 stops. Just like this one, and Eastside was just one of them, one of 35. We had some boys out there at the time, back when things were going good, about two years ago, that was making $150,000 a year.

LAYMANCE: Doing what; counting tickets?

DESIREY: Checking them f----- tickets.

LAYMANCE: Just counting them?

DESIREY: Working 22 hours a week.

Throughout the conversation the defendant bragged about his role in the management of the numbers business and the lucrative nature of the operation. The following statements of the defendant were recorded:

DESIREY: Now, I'm furnishing all the money. I was furnishing all the money....

DESIREY: Well, I'm gonna tell you what. When we got caught in August, the government got the tickets to back this up. They said, according to their figure, that we was doing $300,000 a month. We was doing a little over $200,000 a week, when we got caught. And I was the littlest man in town compared to Resha and them others. Sam Simms and these others. I

mean, you know, there's all these estimates in here. But I'm gonna say the last number on a given day, the first part of the month, there's probably three to five million dollars a week played in the numbers business. I mean, I know you think them are ungodly figures, but....

\* \* \* \* \* \*

DESIREY: But, I mean that's the reason they're on my ass. But, see, they didn't get but about $60,000 off of me that day. And f---, but hell, the sad part about mine is, though two nights before we got caught, I paid one mother f----- $158,000.

The defendant then explained that the reason Laymance and the other officers had collected only small amounts of money in their raids on the market was because the money had not been kept at the market but had been picked up on a regular basis. As the conversation ended, the defendant shook hands with Officer Laymance and passed him two $100.00 bills.

The third taped conversation occurred on December 4, 1990. At this meeting the defendant encouraged Officer Laymance to assist him further by raiding his competition (other markets) in the numbers business. As Laymance prepared to leave, the defendant handed him a brown paper bag containing $200.00 in cash.

The last taped conversation between the defendant and Officer Laymance occurred on December 6, 1990. Before this meeting, Laymance, Lieutenant Blackmore, and General Zimmerman had decided to wind up the investigation, but in doing so, they wanted to see how far the defendant would go and if he would offer Laymance more money to lie to federal officials.

According to the plan, a message from I.R.S. Special Agent Mike Thomas was fabricated and left with Officer Laymance, telling him to produce all of his files on Eastside Market. Laymance took the message to the defendant and called Agent Thomas from the market. Within earshot of the defendant, Laymance was supposedly told to bring the files on the market to Agent Thomas' office.

The defendant became very concerned and began telling Laymance what he should or should not disclose to Agent Thomas. Officer Laymance pretended to become concerned about his own involvement in a federal I.R.S. investigation, and he eventually asked the defendant whether it would "be asking too much for a one time bonus to" answer questions the way the defendant wanted them answered. Officer Laymance quoted a figure of $1,000.00 and asked if that was too much. The defendant said that amount would be fine. Laymance followed the defendant into the garage and the defendant gave him $1,000.00 in cash.

## I

### *KASTIGAR* VIOLATION

■ The defendant contends that his Fifth Amendment and statutory rights were violated when immunized tax information regarding his prior gambling activity was disclosed to local authorities and such information was used to prosecute the defendant for non-tax related crimes. The state submits that this information was not used in convicting the defendant of four counts of bribery of a public servant. We agree.

Before trial, an evidentiary hearing was held on the defendant's motion for a hearing pursuant to *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). The defendant asserted that because Federal Agent Michael Thomas had used immunized federal wagering tax information to secure a search warrant in a federal prosecution[1], a violation of 26 U.S.C. § 4424 had occurred.[2] He argued that because this same information was disclosed to Assistant District Attorney General John Zimmerman, it was the state's burden to prove that the evidence it proposed to use was "derived from a legitimate source wholly independent

of the compelled testimony" as required by *Kastigar*. 406 U.S. at 460, 92 S.Ct. at 1665 (1972).

■ In *Kastigar*, the Supreme Court held that an immunity statute which prohibited the direct or indirect use of compelled testimony and any information derived therefrom was coextensive with the Fifth Amendment privilege against self-incrimination. *Id.* at 453, 92 S.Ct. at 1661. It noted that the "total prohibition on use provides a comprehensive safeguard, barring the use of compelled testimony as an 'investigatory lead,' and also barring the use of any evidence obtained by focusing investigation on a witness as a result of his compelled disclosures." *Id.* at 460, 92 S.Ct. at 1664–65. In conclusion, the Court placed upon the prosecution, once the defendant had demonstrated that he had testified, the burden of showing that "the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony." *Id.* at 460, 92 S.Ct. at 1665.

In this case, General Zimmerman testified at the *Kastigar* hearing that although he had seen the federal search warrant affidavit in August of 1989, neither he nor anyone else in his office had become involved in the investigation of the defendant until November of 1990 when he received a call from Officer Rick Laymance advising him of the bribery attempt. He testified that the raids on the defendant's operations had been initiated by the Central Patrol Unit of the Metro Police Department and that the information disclosed to him had not affected any of his decisions in the prosecution of the defendant's case.

At the same hearing, Officer Laymance testified that he had made ten to twelve raids on Eastside Market before November 19, 1990, the day he was approached by the

---

1. The relevant portion of the search warrant affidavit provides as follows:

 DeSirey filed an application for and obtained from the IRS a wagering stamp relative to him accepting wagers for the period 7/1/88 through 6/30/89....

 IRS records also show that both DeSirey and Bates filed monthly wagering tax returns with the I.R.S. up through May and April of 1989, respectively.

2. 26 U.S.C. § 4424 provides that no Treasury Department official or employee may disclose, except in connection with the administration of the civil or criminal enforcement of internal revenue taxes, any document, record, or other information supplied by a taxpayer in connection with wagering tax returns, payment, or registration.

defendant, and that he had not known before then that the defendant ran Eastside Market. He stated that the first contact he made with General Zimmerman had been on the following day, November 20.

The trial court found that no direct or indirect use of the immunized information in the federal search warrant affidavit had been made by General Zimmerman. It denied the defendant's motion for dismissal.

The record supports the trial court's finding. The bribery attempt began after the local police had made numerous raids on Eastside Market. General Zimmerman became involved in the investigation only after he was contacted by Officer Laymance and his role dealt exclusively with the bribery charges. We hold that the bribery convictions have been shown to be unrelated to the immunized information contained in the federal search warrant affidavit and that the evidence used in this prosecution "was derived from a legitimate source wholly independent" of the immunized information.

## II

### CONSOLIDATION OF OFFENSES– MULTIPLICITY

■ The defendant contends that the trial court should have consolidated the four counts of bribing a public servant into one count because the allegations and evidence against him relate to an ongoing pattern of conduct that constituted only one continuous offense. He asserts that the failure to consolidate violated the "rule against multiplicity" and that he should have been convicted and sentenced for only one offense.

The four counts are based upon the separate payments of money by the defendant with each of the first three counts alleging the payment of $200.00 "with the intent to influence the exercise of discretion by Officer Laymance in his official capacity so as to prevent police interference with the defendant's professional gambling activities conducted at the Eastside Market known also as North 1st Street Market...." The fourth count alleges that he paid $1,000.00 "with the intent to influence the exercise of discretion by Officer Laymance in his official capacity

so as to prevent the said Officer Laymance from relating to agents of the Internal Revenue Service the truth regarding the defendant's professional gambling activities" conducted at the market.

After the state asserted that it expected to prove separate criminal acts on separate days, the trial court refused to consolidate any counts pretrial. The court stated that it would have to hear the evidence before making a decision about how many offenses were proven, but noted that it would instruct the jury, if needed, relative to how to view the multiple counts. After the defendant was convicted, the trial court refused to merge any of the offenses. It stated that although the defendant contemplated from the outset the use of periodic payments, each of the meetings with Officer Laymance "involved additional negotiation of responsibilities and a distinct bribe."

■ Multiplicity is the term applied to the improper charging of the same offense in more than one count. The evils it presents are two-fold. First, as to the trial itself, multiplicity may carry the potential of unfair prejudice, such as suggesting to the jury that a defendant is a multiple offender or falsely bolstering the prosecution's proof on such issues as the defendant's motive or knowledge of wrongdoing. *See United States v. Sue,* 586 F.2d 70, 71 (8th Cir.1978); *United States v. Ketchum,* 320 F.2d 3, 8 (2d Cir.), *cert. denied,* 375 U.S. 905, 84 S.Ct. 194, 11 L.Ed.2d 145 (1963). Second, it can lead to multiple convictions and punishment for only one offense. *See, e.g., Conner v. State,* 531 S.W.2d 119, 122 (Tenn.Crim.App.1975); *Zimmerman v. State,* 173 Tenn. 673, 122 S.W.2d 436 (Tenn.1939). That is, a multiplicitous indictment may lead to a violation of the Double Jeopardy Clause if it results in the imposition of cumulative punishments for only one offense. *See, e.g., Launius v. United States,* 575 F.2d 770, 771 (9th Cir.1978).

■ Preliminarily, we note that the defendant does not contend in any manner that he was prejudiced by either being put to trial on or the jury considering four separate charges instead of one. The record does not indicate any harm and we will not presume that it

exists. Thus, regardless of how the failure to consolidate is viewed, the defendant would not be entitled to a new trial. The actual question in this case is whether the defendant's proven conduct constituted separate offenses under the applicable bribery statute.

The defendant supports his single offense argument with cases dealing with the concept of a general larcenous scheme. In *Nelson v. State*, 208 Tenn. 179, 344 S.W.2d 540 (1960), two officers of a labor union were convicted of one count of fraudulent breach of trust. The proof showed that over a period of eighteen months, without authorization, the defendants signed and cashed eighty-five checks totalling over $6,000. An issue was raised about the propriety of charging relative to all the ·checks in one count. Our supreme court found no Tennessee precedent, but stated the following:

> [T]he general law seems to be in other States that if each taking of these separate checks is the result of a separate independent impulse or intent each taking is a separate crime, but "On the other hand, where it appears that successive takings are actuated by a single, continuing, criminal impulse or intent or are pursuant to the execution of a general larcenous scheme, it has been held or stated that such successive takings constitute a single larceny, regardless of the extent of the time which may have elapsed between each taking." 136 A.L.R., 948, 950. In this note the cases pro and con on the question are ably annotated. This annotation further very correctly says that "Whether a series of successive acts of taking constitutes several thefts or one single crime must be determined by the particular facts and circumstances of each case." [Id. at] 951.

344 S.W.2d at 542. It adopted these statements for use in Tennessee and concluded that the evidence sufficiently proved that the defendants intended to and did set forth upon a continuing course of conduct that could be prosecuted in one count as a general larcenous scheme. 344 S.W.2d at 542–43.

In *Miller v. State*, 210 Tenn. 322, 358 S.W.2d 324 (1962), the defendant was convicted of two counts of petit larceny and one count of grand larceny. The evidence reflected a series of thefts of prescription medicine from the defendant's work place, but nothing indicated which evidence was used to support any particular offense charged. The defendant claimed that none of the takings was proven to involve property valued sufficiently to warrant grand larceny. Relying upon *Nelson*, the court concluded that the facts showed a general larcenous scheme so as to allow the grand larceny conviction, but to disallow the separate petit larceny convictions. 358 S.W.2d at 326–27. In *State v. O'Guin*, 641 S.W.2d 894 (Tenn.Crim.App. 1982), the defendant was convicted of six counts of grand larceny by fraudulent appropriation, relative to the fraudulent sale of six insurance salvage automobiles. Relying on *Nelson*, this court held that a general larcenous scheme was proven and dismissed all but one of the convictions. [*Id.* at] 898.

Taking his cue from these cases, the defendant contends that the evidence proves that he had a single, continuing bribery intent relative to only one public servant and that the series of four payments were merely periodic payments during the course of the same general bribery scheme. However, we do not believe that the general larcenous scheme principle, specially developed for certain larceny-related cases, readily transfers to these bribery offenses. In fact, to do so would be to ignore recognized standards by which we are to determine what is an allowable unit of prosecution under the Double Jeopardy Clause.

■ We note that the single, continuing intent feature of the larcenous scheme principle approved in *Nelson* arose when our courts were often preventing multiple convictions for double jeopardy purposes by using a same transaction test. *See, e.g., Acres v. State*, 484 S.W.2d 534, 537 (Tenn.1972), *cert. denied*, 410 U.S. 937, 93 S.Ct. 1395, 35 L.Ed.2d 601 (1973) (offenses committed as part of a single continuing act inspired by the same criminal intent essential to each offense are susceptible to only one conviction and punishment). In *State v. Black*, 524 S.W.2d 913, 919 (Tenn.1975), though, the Tennessee Supreme Court rejected any form of the same transaction test and stated that resolu-

tion of the question of the validity of multiple convictions in a single trial "requires close and careful analysis of the offenses involved, the statutory definitions of the crimes, the legislative intent and the particular facts and circumstances." Under this analysis, the fact that a defendant may have a continuing intent to embark upon a course of repetitive criminal activity has little bearing on how many separate offenses may be committed under a particular criminal statute.[3] *See, e.g., Anderson v. State,* 553 S.W.2d 85, 88 (Tenn.Crim.App.1977) (unity of intent did not merge the offenses of forgery and uttering a forged instrument).

 As *Black* indicates, the analysis is primarily one of statutory interpretation. This is because " '[t]he power to define what shall constitute a criminal offense is committed to the discretion of the legislature, subject to constitutional limitation and safeguards....' " *State v. Hale,* 840 S.W.2d 307, 314 (Tenn.1992) (quoting from *Hall v. State,* 151 Tenn. 416, 418, 270 S.W. 84, 85 (1925)). This power includes the right to criminalize individual acts separately or collectively as a course of continuing conduct. Thus, the role of the Double Jeopardy Clause in cases of multiple convictions occurring in one trial "is limited to assuring that the court does not exceed its legislative authorization by imposing multiple punishments for the same offense." *Brown v. Ohio,* 432 U.S. 161, 165, 97 S.Ct. 2221, 2225, 53 L.Ed.2d 187 (1977). In other words, to determine how many offenses or punishments are permissible, we must determine how many offenses or punishments the legislature intended to provide. *See Albernaz v. United States,* 450 U.S. 333, 344, 101 S.Ct. 1137, 1145 (1981). Once this is determined, we need only to review the evidence under the statute in order to resolve the issue raised by the defendant.

 In *State v. Davis,* 654 S.W.2d 688 (Tenn.Crim.App.1983), this court provided an excellent example of the analysis needed to determine the allowable units of prosecution provided by a criminal statute. Generally, if the statute prohibits individual acts, then each act is punishable separately. However, if it prohibits the course of action which the several acts constitute, then there can be only one penalty. *Id.* at 696. Also, given the legislature's power to define what it desires to be a unit of prosecution, it has the duty to do so clearly and without ambiguity. In the event the legislature fails in this duty, the courts will resolve ambiguity in favor of lenity. *Id.; see Bell v. United States,* 349 U.S. 81, 83–84, 75 S.Ct. 620, 622, 99 L.Ed. 905 (1955) (Congress has the ability in expressing its intent "to make each stick in a faggot a single criminal unit," but ambiguity arising from an undeclared intent will be resolved against turning a single transaction into multiple offenses.)

 Legislative intent may be discerned by looking to "the language of the statute, its subject matter, the object and reach of the statute, the wrong or evil which it seeks to remedy or prevent, and the purpose sought to be accomplished in its enactment...." *Mascari v. Raines,* 220 Tenn. 234, 239, 415 S.W.2d 874, 876 (1967). As for criminal offenses in Tennessee, the statutes are to be construed "according to the fair import of their terms, including reference to judicial decisions and common law interpretations, to promote justice, and effect the objectives of the criminal code." T.C.A. § 39–11–104; *see State v. Horton,* 880 S.W.2d 732, 734–35 (Tenn.Crim.App.1994).

 In this case, the defendant was convicted for violating T.C.A. § 39–16–102 which, in part, provides:

> *Bribery of public servant.*—(a) A person commits an offense who:
>
> (1) Offers, confers, or agrees to confer any pecuniary benefit upon a public servant with the intent to influence the public servant's vote, opinion, judgment, exercise of discretion or other action in the public servant's official capacity; or
>
> (2) While a public servant, solicits, accepts or agrees to accept any pecuniary

---

**3.** We do not mean to imply that the general larcenous scheme principle no longer applies in an appropriate case. However, given the holding in *Black,* we conclude that any continued vitality the principle has, relative to a single continuing intent, remains limited to theft-related cases until our supreme court provides otherwise.

benefit upon an agreement or understanding that the public servant's vote, opinion, judgment, exercise of discretion or other action as a public servant will thereby be influenced.

Obviously, the defendant's convictions are under T.C.A. § 39–16–102(a)(1). This provision deals with a person's act, the intent to influence by the act, and the action to be influenced. By its terms, it covers an offender's act whether it is an offer, an agreement, or the actual conferring of any pecuniary benefit. In *State v. Thurman,* 3 Tenn.Cas. (3 Shan.) 649 (1875), our supreme court held that each bet made by a person during a continuing game of chance constituted a separate offense under a statute that not only prohibited the playing of a game of chance, but also the making of " 'any bet or wager for money....' " In similar fashion, although the bribery statute condemns a single offer or agreement that may involve continuing influence, it also addresses individual offers or payments made for influence purposes.

The federal courts have reached a similar conclusion under 18 U.S.C. § 201(b), which provides in part that a person who "corruptly gives, offers or promises anything of value to any public official" commits an offense.[4] In *United States v. Anderson,* 509 F.2d 312, 333 (D.C.Cir.1974), *cert. denied,* 420 U.S. 991, 95 S.Ct. 1427, 43 L.Ed.2d 672 (1975), three separate payments to the benefit of one senator for the purpose of influencing his action on postal-rate legislation were held to be three offenses, with the court noting that "courts construing other bribery laws have discarded the 'installment' theory of bribery in favor of the view that each bribe warrants a separate penalty." In fact, in *United States v. Bernstein,* 533 F.2d 775, 799–800, 809 n. 7 (2d Cir.), *cert. denied,* 429 U.S. 998, 97 S.Ct. 523, 50 L.Ed.2d 608 (1976), a lump sum payment of $350.00 to a federal official pursuant to a bribery arrangement of $50.00 per property appraisal was held to constitute seven offenses. Also relevant to the instant case is

*Patton v. United States,* 42 F.2d 68 (8th Cir.1930), in which the defendants were convicted of seven bribery offenses upon proof that they made $500.00 payments to a prohibition agent every two weeks for protection against arrest for liquor violations. The court considered each payment to relate to two weeks' protection and held that each payment was a separate offense. *Id.* at 69.

In the present case, Officer Laymance's continuing obligation as a law enforcement officer included the investigation and prevention of crime and the arresting of criminal offenders. These duties entailed the exercise of considerable discretion, as well, relative to when and how to take such action as he deemed most appropriate to carry out his duties. As is shown in this case, an example of this discretion was the decision to conduct repetitive raids over a short period of time of an establishment that Officer Laymance had reason to believe was the site of an ongoing gambling business. Unquestionably, a continuing influence was contemplated by the defendant under the agreement by which Officer Laymance was paid weekly. However, each payment was intended to carry and would carry its own corrupting influence for an additional week, regardless of whether or not any new negotiation of responsibilities occurred. Under these circumstances, we believe that each payment constituted evidence of a separate bribery offense.

## III

### CONSECUTIVE SENTENCES

Finally, the defendant contends that the trial court erred in ordering consecutive sentences in that it improperly characterized him as a professional criminal and that the aggregate of the consecutive terms is not reasonably related to the severity of the offenses involved. T.C.A. § 40–35–115(b)(1) provides that a trial court may require consecutive sentences if it finds by a preponderance of the evidence that a defendant "is a

---

**4.** Before 1989, T.C.A. § 39–5–103 (1982) [repealed 1989] defined bribery of a peace officer as follows:

Any person who corruptly offers, promises, or gives, to any police officer or official ... any

gift, gratuity, or thing of value with intent to influence his act or acts as such officer ... or to cause him to refrain or desist from performing his duty as such....

professional criminal who has knowingly devoted himself to criminal acts as a major source of livelihood." The trial court made the following findings:

> Even though the defendant was not convicted of the gambling charges against him, for sentencing purposes, the Court may look at the evidence in the record of the defendant's gambling activities. The record establishes through the defendant's admissions to the police officer that he had made a very good, long-term livelihood through numbers and video poker machines. The record further establishes that the defendant knew that he was violating the law by supporting himself in this manner.

The trial court stated that the defendant could properly be characterized as a professional criminal and it ordered all the defendant's sentences to be served consecutively.

▮▮▮ Appellate review of sentencing is *de novo* on the record with a presumption that the trial court's determinations are correct. *See* T.C.A. § 40–35–401(d). As the Sentencing Commission Comments to this section notes, the burden is now on the defendant to show that the sentencing was improper. However, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." *State v. Ashby,* 823 S.W.2d 166, 169 (Tenn. 1991). In this respect, for the purpose of review, the trial court is to preserve in the record the sentencing factors it found to apply and the specific findings of fact upon which it applied the sentencing principles in arriving at the ultimate sentence. *See, e.g.,* T.C.A. §§ 40–35–210(f) and –209(c).

### A

▮▮▮ First, the defendant contends that the trial court improperly based its characterization of him as a professional criminal on evidence and charges for which he was acquitted. Also, he asserts that the preponderance of the evidence did not prove that criminal acts were a means from which he derived a major source of his livelihood.

▮▮▮ The defendant cites *State v. Holman,* 611 S.W.2d 411 (Tenn.1981), in contending that evidence indicating that he committed another crime should not be considered by the trial court for sentencing purposes when he has been acquitted of that other crime. In *Holman,* the supreme court held that in a trial on the issue of guilt, "evidence that the defendant committed an alleged crime other than that for which he is on trial should not be admitted when he has been acquitted of such alleged other crime." *Id.* at 413. In adopting what the dissent said was the minority rule, the court relied upon the fact that Tennessee conditioned admissibility of other crimes evidence in a trial upon a showing (1) by clear and convincing evidence that the defendant committed the other crime and (2) that the probative value of the evidence is not outweighed by its prejudicial effect. *Id.* at 412–13; *see Bunch v. State,* 605 S.W.2d 227, 229 (Tenn.1980); *Caruthers v. State,* 219 Tenn. 21, 406 S.W.2d 159 (1966); Tenn.R.Evid. 404(b), Advisory Commission Comment. The court concluded that an acquittal rendered any evidence of the other crime to be less than clear and convincing and less probative than prejudicial. *Holman,* 611 S.W.2d at 413.

▮▮▮ We do not believe that the concerns in a jury trial upon which the *Holman* decision was based apply equally to a sentencing hearing conducted by a trial court pursuant to the 1989 Sentencing Reform Act. We note that the trial court's factual findings relative to the consecutive sentencing criterion need only be made under a preponderance of the evidence standard. An acquittal is normally not considered for evidentiary purposes to equate with factual innocence, only with the existence of a reasonable doubt. As such, an acquittal is not viewed to negate the possibility that criminal involvement may be shown to have existed by a preponderance of the evidence. *See, e.g., Tennessee Odin Ins. Co. v. Dickey,* 190 Tenn. 96, 228 S.W.2d 73, 74–75 (1950); *United States v. One Assortment of 89 Firearms,* 465 U.S. 354, 361–62, 104 S.Ct. 1099, 1104, 79 L.Ed.2d 361 (1984). It is this different standard of proof upon which federal courts rely to allow a sentenc-

ing court to consider conduct that is relevant to sentencing even if the defendant has been acquitted of a charge relating to that conduct. *See, e.g., United States v. Roach,* 28 F.3d 729, 736 (8th Cir.1994); *United States v. Welch,* 945 F.2d 1378, 1385 (7th Cir.1991), *cert. denied,* 502 U.S. 1118, 112 S.Ct. 1235, 117 L.Ed.2d 469 (1992); *United States v. Manor,* 936 F.2d 1238, 1242 (11th Cir.1991).

On the other hand, this court has been reluctant to consider evidence of an offense for which a defendant is acquitted. *See State v. David W. Andrews,* No. 02C01–9201–CC–00024, Henry Co., slip op. at 4, 1993 WL 8606 (Tenn.Crim.App. Jan. 20, 1993) (DUI sentence could not be enhanced because of accident and deadly injury when defendant acquitted of vehicular homicide); *State v. Greg Patterson,* No. 03C01–9106–CR–180, Loudon Co., slip op. at 9, 1992 WL 104759 (Tenn. Crim.App. May 19, 1992) (murder sentence could not be enhanced because of multiple victims when defendant acquitted of murdering second victim); *State v. Jerry W. Harbin,* No. 01–C–01–9107–CC–00203, Coffee Co., 1992 WL 62023 (Tenn.Crim.App. Mar. 31, 1992), *app. denied* (Tenn. July 6, 1992) (driving on revoked license sentence could not be enhanced because of defendant's intoxicated driving condition when defendant acquitted of DUI); *but see State v. Jeff Arwood,* No. 01C01–9204–CC–00132, Lincoln Co., 1992 WL 389628 (Tenn.Crim.App. Dec. 31, 1992), *app. denied* (Tenn. May 10, 1993) (acquittal for *aggravated* rape related to victim's age did not bar reliance upon victim's age to enhance sentence for rape to Range II).

However, we need not determine in this case the extent to which a sentencing court should be allowed to rely upon evidence of crime for which a defendant is acquitted. The record establishes that the trial court relied upon the contents of the defendant's taped conversations in concluding that he was substantially involved in illegal gambling and deriving substantial income therefrom. In these conversations, he discussed details of his numbers business in terms of locations, amounts of money taken in, and the amounts he had paid some employees in the business. Significantly, his comments showed his substantial involvement with illegal gambling

outside of the time frame presented by the charges of which he was acquitted. In other words, his acquittal on the specific charges did not relate to most of the evidence of his past criminal conduct. *See, e.g., United States v. Sweig,* 454 F.2d 181, 184 (7th Cir. 1972) ("Acquittal does not have the effect of conclusively establishing the untruth of all of the evidence introduced against the defendant.")

Also, the defendant's references to the numbers business bringing in $2,000.00 to $2,500.00 per day, previously doing over $200,000.00 a week in business, previously paying employees as much as $150,000.00 a year to check tickets, and to his living on $2,000.00 or $3,000.00 a week that he was making from the business easily show that the moneys generated from the illegal gambling constituted a major source of livelihood. In fact, the defendant explained that the small amount of money seized by the officers in recent raids resulted from the fact that the money was not kept at the market, but picked up on a regular basis. Under all of these circumstances, the record does not preponderate against the trial court's determination that the defendant was a professional criminal.

**B**

The defendant contends that the eighteen-year aggregate of the sentences is not reasonably related to the severity of the offenses and that consecutive sentences are not justified under all of the existing circumstances. The record reflects that although the trial court entered a four-page written sentencing order, its requirement that all of the sentences should be served consecutively was based merely upon its determination that the defendant was a professional criminal. In this respect, the sentencing order provides no indication that the trial court made an assessment of whether or not an eighteen-year aggregate sentence was needed to protect society from the defendant's future criminal conduct or of whether or not such a sentence reasonably related to the severity of the offenses.

The Sentencing Commission Comments to T.C.A. § 40–35–115 reflect that most of the

multiple sentence statute is essentially a codification of two cases, *Gray v. State*, 538 S.W.2d 391 (Tenn.1976), and *State v. Taylor*, 739 S.W.2d 227 (Tenn.1987). In *Gray*, the supreme court stated that "a consecutive sentence should be imposed only after a finding by the trial judge that confinement for such a term is necessary in order to protect the public from further criminal conduct by the defendant." 538 S.W.2d at 393. It indicated that the essential purpose of consecutive sentencing is "to protect society from those who are unwilling to lead a productive life and resort to criminal activity in furtherance of their anti-societal lifestyle." *Id.* Also, it believed that the significance of the professional criminal, as with the persistent offender, is that his history will indicate that he is not likely to be rehabilitated. *Id.*

In *Taylor*, the court cautioned that consecutive sentences should not routinely be imposed in multiple offense cases and that the aggregate sum "must be reasonably related to the severity of the offenses involved." 739 S.W.2d at 230. These cautionary statements are noted in the Sentencing Commission Comments to T.C.A. § 40–35–115, with the Comments adding that although the statute permits consecutive sentencing, "the trial judge has other available options, such as increasing the length of their sentence within the appropriate range depending on the presence of enhancement factors."

■ Also, the general concepts contained in *Gray* and *Taylor* are repeated in the 1989 Sentencing Reform Act's stated principles that are to apply to sentencing. *See* T.C.A. §§ 40–35–102 and –103. It is apparent that the legislature intended for the consecutive sentencing statute to be used in conjunction with, not apart from, the remaining provisions of the 1989 Act. Thus, even relative to considering consecutive sentencing, the 1989 Act requires the trial court to insure that the aggregate sentence imposed should be the least severe measure necessary to protect the public from a defendant's future criminal conduct and should bear some relationship to a defendant's potential for rehabilitation. *See* T.C.A. § 40–35–103(4) and (5).

■ As previously noted, the trial court in the present case made no finding that the defendant's confinement for an aggregate term of eighteen years was necessary to protect the public from the defendant's further criminal conduct. In effect, it used the professional criminal determination to make all of the sentences consecutive in rote fashion. In fact, the other concerns discussed by the trial court in its sentencing order were expressly intended by it to relate only to the issue of whether the defendant should be confined or be given a sentencing alternative to confinement, with the trial court stressing the need to insure that the seriousness of the defendant's conduct was not depreciated and to set the defendant's punishment as an example to others who might contemplate the committing of similar acts. As implied by the trial court's treatment, although both aims are quite relevant to the issue of confinement, *see* T.C.A. § 40–35–103(1), they are of much less consequence relative to the central purpose for consecutive sentencing.

■ We recognize that the offense of bribery strikes at the heart of our system of justice and that a sentence to confinement under the circumstances in this case is necessary in order that the seriousness of the defendant's conduct will not be depreciated. However, the record does not contain substantial evidence to support a finding that confinement under an eighteen-year sentence is necessary to protect the public. At the time of sentencing, the defendant had completed serving a term of confinement in a halfway house required as a result of his tax-related federal prosecution. The federal program manager reported that the defendant had complied with all the conditions of his placement and had not presented conduct or disciplinary problems. In fact, the defendant voluntarily remained at the halfway house after he was entitled to leave. Also, the defendant was gainfully employed in a lawful occupation at the time of sentencing in this case. The record shows substantial potential for rehabilitation not ordinarily associated with a professional criminal.

■ As for the relationship of the aggregate sentence to the severity of the defendant's criminal conduct, we are mindful that the offenses were nonviolent, were directed

at one public servant and consisted of a short series of similar, related conduct of an ongoing nature. We note that our supreme court has considered the fact that offenses which overlap with the same intent can make concurrent sentencing appropriate. *See State v. Holt,* 691 S.W.2d 520, 522 (Tenn.1984). Such is the case before us.

In sum, although the record supports the imposition of a consecutive sentence as a means of personal deterrence of the defendant because of his history of disregard for society's laws, there is not substantial evidence to justify an eighteen-year aggregate sum. The nonviolent nature of the offenses, the circumstances connecting the offenses to each other, and the defendant's potential for rehabilitation as exhibited relative to the federal sentence lead us to conclude that a lesser sentence will sufficiently protect the public, reasonably relate to the severity of the offenses involved, and satisfy the interests of justice.

Accordingly, we affirm the defendant's convictions and the length of the sentence imposed upon each count. However, we order that the sentences for counts one, two and three be served concurrently and the sentence for count four be served consecutively, resulting in an effective sentence of nine years.

PEAY, J., concurs.

C. CREED McGINLEY, Special Judge, concurs and dissents.

C. CREED McGINLEY, Special Judge, concurring and dissenting.

Judge Tipton authored a very scholarly opinion affirming the convictions of the defendant for four (4) separate counts of bribery of a public servant. I concur in the analysis and results reached by the majority opinion with the exception of that portion of the opinion modifying the sentence imposed by the trial court. I strongly believe that the opinion of the majority fails to give deference to the presumption of correctness that is to be afforded the determinations of the trial court mandated by the "Tennessee Criminal Sentencing Reform Act of 1989". Tenn.Code Ann. § 40–35–401(d). I would, without hesi-

tation, affirm the sentences as ordered by the trial court.

The majority opinion affirmed the trial court's classification of the defendant as a "professional criminal who has knowingly devoted himself to criminal acts as a major source of livelihood". This determination need only to have been made by a preponderance of the evidence and having been so determined the Court *may* order sentences to run consecutive. *See* Tenn.Code Ann. § 40–35–115(b)(1). This vests the discretion in the trial court to sentence consecutively but obviously subject to the sentencing principles embodied in the Sentencing Reform Act. The trial court meticulously followed these principles and made detailed findings in both a written sentencing order as well as oral findings on the record. The record supports that the trial judge painstakingly explored all possibilities, including alternative sentencing, prior to fashioning an appropriate sentence given the circumstances of the offenses and the status of the offender. This sentence was carefully crafted by the judge, taking into consideration untold hours of testimony, and after obvious deep reflection.

The majority opinion in this case ruled that the aggregate sentences imposed in this case were not reasonably related to the severity of the offenses. The trial judge made specific findings in her sentencing order relative to the need for a severe sentence. The Court stated "when a defendant repeatedly bribes a police officer to prevent arrest, prosecution, curtailment of profit and to control the content of the officer's sworn testimony to federal authorities, it is imperative that the manner of service of the sentences be severe. Anything but a sentence with a significant punitive element would undermine the criminal justice system." The majority opinion essentially found that the eighteen (18) year sentence ordered by the trial court was not supported by the evidence but that the evidence would support the imposition of a nine (9) year effective sentence. This is merely a substitution of the judgment of the appellate court for the judgment of the trial court. The trial court had the benefit of hearing live testimony and evidence during a five (5) day trial in addition to untold hours

of hearing evidence associated with pre-trial motions. The trial court's informed judgment based upon its intimate involvement in all stages of this case should not be lightly disregarded. It should at least be afforded the presumption of correctness mandated by law.

In *State v. Fletcher*, 805 S.W.2d 785 (Tenn. Crim.App.1991), this Court examined the standard of review and found that if the trial court properly considered the relevant factors, and if the findings of fact by the trial court were "adequately supported by the record, then the appellate court must affirm, even if it would have preferred a different result." *Id.*, at 789. On appeal, the burden is on the defendant to show that the sentence imposed was improper. *Fletcher*, at 786. The record in the present case supports the trial court's sentence.

As recognized by the majority opinion the convicted offenses of bribery strike at the heart of our system of justice. Confinement is necessary under the circumstances of this case in order that the seriousness of the defendant's conduct not be depreciated. Although the trial judge did not recite a specific litany that the eighteen (18) year aggregate sentence was needed to protect society and reasonably related to the severity of the offenses, it is clear that the Court gave strong consideration to the same in the extensive sentencing hearing. The hearing was certainly not done in rote fashion. Contrary to the majority, it is my opinion that the record does contain the evidence to support a finding that confinement under an eighteen (18) year sentence is necessary to protect the public. The trial court's designation of the defendant as a professional criminal, if anything, is an understatement. The defendant in this case is the embodiment of a professional criminal engaged in organized crime, from which society should be afforded protection.

In conclusion, I find that the majority opinion is an impermissible encroachment on the function and discretion of the trial judge. The modification of sentence is merely a substitution of judgment by the appellate court and constitutes an inappropriate departure from the proper standard of appellate review. I would affirm the sentence as ordered by the trial judge.