IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs August 3, 2004

## STATE OF TENNESSEE v. RECARDO DALE

**Direct Appeal from the Criminal Court for Shelby County**
**No. 02-01377     Joseph B. Dailey, Judge**

---

**No. W2003-02391-CCA-R3-CD  -  Filed January 10, 2005**

---

Following a jury trial, Defendant, Recardo Dale, was convicted of one count of especially aggravated robbery and one count of attempted first degree murder. The trial court sentenced Defendant as a Range I standard offender to twenty-five years for the especially aggravated robbery conviction and twenty-five years for the criminal attempt conviction. The trial court ordered Defendant's sentences to be served consecutively for an effective sentence of fifty years. Defendant appeals the sufficiency of the convicting evidence, the lengths of his sentences, and the imposition of consecutive sentencing. Since the filing of the briefs, Defendant has also asked us to consider the impact of the ruling in *Blakely v. Washington*, 542 U.S. ___, 124 S. Ct. 2531 (2004) on the lengths of his sentences. After a thorough review of the record, we affirm Defendant's convictions and the imposition of consecutive sentencing. Pursuant to the holding in *Blakely*, we modify each sentence to twenty-two years, for an effective sentence of forty-four years.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Trial Court Affirmed;**
**Sentences Modified**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and NORMA MCGEE OGLE, J., joined.

Robert Wilson Jones, District Public Defender; Tony N. Brayton, Assistant Public Defender; and Trent Hall, Assistant Public Defender, for the appellant, Recardo Dale.

Paul G. Summers, Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General; William L. Gibbons, District Attorney General; and Betsy Carnesale, Assistant District Attorney General, for the appellee, the State of Tennessee.

**OPINION**

## I. Background

Tori Davis testified that she was sitting on her front porch when she saw a man, whom she later identified as Defendant, flag down a car in front of her house. Defendant, whose face was

visible in the streetlight, crossed the street and walked up to the car. Ms. Davis said that she heard one gunshot followed by a second shot at which point Ms. Davis went into her house and closed the front door. While she checked on her son, Ms. Davis attempted to call 911 but did not get through. A few minutes later, the 911 operator called back and told Ms. Davis that the incident had already been reported.

Ms. Davis said that the victim's car was parked about twenty feet from her front porch. She knew of Defendant because she had seen him in the neighborhood where his mother lived. She did not know the victim who was driving the car but knew his passenger, John Wilson. Ms. Davis said that Mr. Wilson fled from the car when the shooting began and ran up the hill behind the street.

Ms. Davis said that she went down the street to Church's Fried Chicken to get something to eat. The police were interviewing people in the restaurant about the shooting, and someone pointed her out as a witness. Ms. Davis said that she did not at first voluntarily talk with the police because her children were at home asleep. She later gave a statement, however, and told the police that Defendant was the shooter. The police showed her a photographic line-up, and she identified Defendant as the assailant.

Marcus Martin, the victim, said he arrived at John Wilson's house around 10:00 p.m. in his white 1989 Oldsmobile. Mr. Martin said he was shot the first time as Mr. Wilson was opening the car door. Two more shots were fired through the open back window. Mr. Martin put the car in park and fell out of the car into the street where he was shot one more time in the arm. Mr. Martin said that the shooter got in the car and said, "I finally got this car." After his car pulled out, Mr. Martin heard some voices across the street say, "Lay down or we're going to kill you." Mr. Martin, however, ran to Church's Fried Chicken for help.

Mr. Martin said that he could not identify his assailant. All he saw was a person with a hat and a bandana wrapped around the lower half of his face. Mr. Martin denied that there was a streetlight near the location of the incident and said that the shooter approached his car from the curb rather than from across the street. Mr. Martin conceded that he knew Defendant because he had gone to school with him. He said he never looked at the shooter, however, because he was in shock. Mr. Martin said that his car was found in Mississippi. Mr. Martin said that the steering wheel, music recordings and radio were gone. The center pieces of the car's hubcaps were on the front seat.

John Wilson said that he had just gotten into Mr. Martin's car when the first shot was fired. He exited the car and ran across the street and up a hill to safety. Mr. Wilson said that he waited a few minutes and then went to his mother's house. His mother called 911. Mr. Wilson said that he did not see who shot Mr. Martin and did not hear anybody say anything. Mr. Wilson admitted that he knew Defendant by name but said that he did not look in the shooter's direction before he ran. On cross-examination, Mr. Wilson said that the shooter approached from the curb. Mr. Wilson further denied seeing anyone try to flag Mr. Martin down.

Officer Angela Muhammad said that Mr. Martin was still conscious when she arrived at Church's Fried Chicken. Mr. Martin told Officer Muhammad that he did not know who shot him. A few members of the crowd that had gathered at the fast-food restaurant told Officer Muhammad that they would not discuss the incident because the shooter's friends were listening to see who talked to the police. Officer Muhammad said she asked everyone to leave. About ten minutes later, two women approached and told Officer Muhammad that they had seen what happened.

Sergeant Brad Ragland said that Defendant called him two days after the incident and said that he had heard Sergeant Ragland was looking for him. Defendant told Sergeant Ragland that his friends would vouch for his whereabouts at the time the shooting occurred. Sergeant Ragland asked Defendant to come down to the police station, but Defendant did not show up. Sergeant Ragland showed Ms. Davis a photographic line-up on the day that Defendant called, and, without hesitation, Ms. Davis identified Defendant as the shooter.

Sergeant Ragland entered the information concerning Mr. Martin's car on NCIC and received a call a few days later informing him that Mr. Martin's car was in Mississippi. A fingerprint belonging to Defendant was discovered on a center hubcap piece in the car. Defendant was arrested on May 17, 2001. Defendant said that he did not know the victim and had never been around Mr. Martin's car. Defendant continued to maintain his innocence even after confronted with the fingerprint evidence.

On cross-examination, Sergeant Ragland admitted that Ms. Davis was an evasive and uncooperative witness. On redirect, however, Sergeant Ragland explained that he did not think Ms. Davis was untruthful, just scared. Sergeant Ragland said that he put two extra patrols on duty around Ms. Davis' house after the incident.

Jerry Sims, a fingerprint examiner with the Memphis Police Department, testified that the fingerprint from the right thumb lifted from the center hubcap piece discovered in the victim's car matched the Defendant's right thumb print which was on file in the department, and identified as file no. 257794. Bobby Spence, a fingerprint technician with the Shelby County Sheriff's Department, obtained Defendant's fingerprints in court during the trial. Mr. Spence then compared Defendant's fingerprints with the fingerprints in file no. 257794. Mr. Spence testified that the two sets of fingerprints matched, and that Defendant was thus the same person whose fingerprints were on file in file no. 257794.

On the basis of this evidence, the jury convicted Defendant of especially aggravated robbery and attempted first degree murder.

## II. Sufficiency of the Evidence

Defendant argues that while there is some evidence to support his convictions, such evidence does not support a finding beyond a reasonable doubt that Defendant was the perpetrator of the offenses. In other words, Defendant asks this Court to reevaluate and reweigh the evidence

presented to the jury, which we cannot do. Once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Black*, 815 S.W.2d 166, 175 (Tenn. 1991). The jury is presumed to have resolved all conflicts and drawn any reasonable inferences in favor of the State. *State v. Sheffield,* 676 S.W.2d 542, 547 (Tenn. 1984). Questions concerning the credibility of witnesses, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).

When a defendant challenges the sufficiency of the convicting evidence, we must review the evidence in the light most favorable to the prosecution in determining whether a rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S.307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979). The defendant has the burden of overcoming this presumption, and the State is entitled to the strongest legitimate view of the evidence along with all reasonable inferences which may be drawn from that evidence. *Id.; State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

Defendant does not contest that Mr. Martin was robbed of his car at gunpoint and suffered four gunshot wounds in the process. Instead, Defendant argues that the evidence was insufficient for the jury to find him to be the perpetrator of the offenses beyond a reasonable doubt. Questions involving the credibility of eyewitness testimony identifying the defendant as the perpetrator are for determination by the jury, not this Court. *State v. Strickland*, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993). The jury by its verdict obviously accredited Ms. Davis who identified Defendant as the shooter. Ms. Davis' testimony coupled with the presence of Defendant's fingerprint on a car part located in the front seat of Mr. Martin's car is sufficient to support Defendant's convictions for especially aggravated robbery and attempted first degree murder.

## III. Lengths of Sentences

Defendant argues that the trial court misapplied enhancement factor (7), the victim's injuries were particularly great, to Defendant's sentence for especially aggravated robbery. Tenn. Code Ann. § 40-35-114(7). The State concedes it was error for the trial court to apply factor (7), and we agree. The trial court also applied factor (2), Defendant has a history of prior convictions, to both sentences, and factor (10), Defendant used a gun in the commission of the offense, as well as factor (7), to his attempted first degree murder conviction. Tenn. Code Ann. § 40-35-114(2), (7), and (10). Although Defendant did not raise any issues concerning the trial court's application of these enhancement factors in his initial brief, Defendant subsequently asked this Court to consider the impact of the ruling in *Blakely v. Washington*, 542 U.S. ___, 124 S. Ct. 2531 (2004), as to the length, of his sentences. Because *Blakely* calls into question the continuing validity of our current sentencing scheme, we are constrained to address Defendant's sentences in light of this case.

We first address the State's initial argument that Defendant has waived any sentencing issues that are implicated by *Blakely* under Rules 3(e) and 36(a) of the Tennessee Rules of Appellate Procedure. The State contends that the *Blakely* court did not pronounce a new rule of law but merely

applied the existing rule of *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000). The State submits that Defendant, like the defendant in *Blakely*, could have raised his issues under *Apprendi* at either the trial court level or in his direct appeal.

In *Apprendi*, the prosecution requested the trial court to "enhance" the defendant's sentence for his conviction of second-degree possession of a firearm on the basis that the offense was committed with a biased purpose. *Apprendi*, 530 U.S. at 470, 120 S. Ct. at 2352. Following an evidentiary hearing, the trial court determined that the "hate crime" sentence enhancer was applicable and sentenced the defendant to twelve years' imprisonment. The standard statutory punishment range for the offense was five to ten years. *Id.* at 471; 120 S. Ct. at 2352.

The United States Supreme Court reversed. Considering both the due process rights protected by the Fourteenth Amendment and the criminal defendant's Sixth Amendment right to a trial by jury, the Court concluded that an accused is entitled to "'a jury determination that [he] is guilty of every element of the crime with which he is charged beyond a reasonable doubt.'" *Id.* at 477, 120 S. Ct. at 2357 (quoting *United States v. Gaudin*, 515 U.S. 506, 510, 115 S. Ct. 2310, 132 L. Ed. 2d 444 (1995)). Merely labeling a factor a "sentencing enhancer" under the provisions of a state's criminal code does not "provide a principled basis for treating" the two acts differently. *Id.* at 495-96, 120 S. Ct. at 2365; *see also Ring v. Arizona*, 536 U.S. 584, 602, 122 S. Ct. 2428, 2439, 153 L. Ed. 2d 556 (2002). "If a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact–no matter how the State labels it–must be found by a jury beyond a reasonable doubt." *Ring*, 536 U.S. at 602, 122 S. Ct. at 2439 (citing *Apprendi*, 530 U.S. at 482-483, 120 S. Ct. 2348).

The *Apprendi* Court emphasized, however, "that nothing in [the] history [of the common law] suggests that it is impermissible for judges to exercise discretion–taking into consideration various factors relating both to offense and offender–in imposing a judgment *within the range* prescribed by statute." *Apprendi*, 530 U.S. at 481, 120 S. Ct. at 2358 (emphasis in original).

Thus, the Supreme Court of Tennessee concluded that under *Apprendi*, a trial court still retained its discretion to consider applicable enhancement and mitigating factors so long as the defendant's sentence is not enhanced beyond the statutory maximum. *Graham v. State*, 90 S.W.3d 687, 692 (Tenn. 2002).

Defendant's sentence in the case *sub judice*, although above the presumptive sentence for a Class A felony based upon the trial court's finding of several enhancement factors, is still within the statutory range of punishment for his offense. Had Defendant challenged the length of his sentence solely under *Apprendi*, therefore, his argument would have been rejected under clear case law authority, by trial and appellate courts in Tennessee. *See Graham*, 90 S.W.3d at 692.

In *Blakely*, the United States Supreme Court revisited the *Apprendi* rule in the context of a sentence enhanced by the trial court above the standard range assigned to the defendant's felony conviction but still within the maximum statutory range for that class of felony. *Blakely,* 124 S. Ct.

at 2537.  Although the prosecution argued that this sentence did not violate *Apprendi*, the *Blakely* Court explained that the relevant "statutory maximum" which forms the basis of the *Apprendi* rule "is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings."  *Blakely*, 124 S. Ct. at 2537.  In light of the state of the law existing at the time Defendant was sentenced, Defendant cannot be said to have waived his right to a jury trial relating to the determination of the length of his sentence based on additional facts not submitted to the jury.  Consideration of the impact of *Blakely* on the sentencing issues presented herein is therefore appropriate.

In the case *sub judice*, Defendant was convicted of two Class A felonies as a Range I standard offender.  Although the statutory sentencing range for a Class A felony is not less than fifteen years nor more than twenty-five years, the presumptive sentence is twenty years, the midpoint of the range.  Tenn. Code Ann. §§ 40-35-112(1); 40-35-210(c).  After taking into consideration enhancement factors under our sentencing act based on Defendant's prior criminal record, the extent of personal injuries suffered by the victim, and Defendant's use of a gun during the commission of the attempted first degree murder offense, the trial court sentenced Defendant to twenty-five years for each conviction, or the maximum sentence within the offenses' statutory range.  *See id.* § 40-35-114(2), (7), and (21).

The *Blakely* Court warns that "[w]hen a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts 'which the law makes essential to the punishment . . . and the judge exceeds his proper authority."  *Blakely*, 124 S. Ct. at 2537 (quoting 1 J. Bishop, Criminal Procedure § 87 (2d ed. 1872)).  In *Blakely*, the defendant's conviction of second-degree kidnapping with a firearm carried a "standard range" of punishment' of forty-nine to fifty-three months.  *Id.* at 2535.  Following an evidentiary hearing, the trial court found as a sentencing factor that the defendant had acted with "deliberate cruelty," and sentenced the defendant to ninety months' imprisonment.  *Id.*  The United States Supreme Court observed, however, that the trial judge could not have sentenced the defendant to ninety months based solely on the facts presented in the plea agreement.  The defendant in *Blakely* did not admit that he had acted with deliberate cruelty nor did a jury find the presence of such conduct.  *Id.* at 2536.  "'Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.'"  *Id.* (quoting *Apprendi*, 530 U. S. at 490).  The statutory maximum sentence in *Blakely* based on the facts presented in the defendant's plea agreement was not ninety months, but fifty-three months.  *Id.* at 2537.

Enhancement of each of Defendant's sentences in the case *sub judice* based on his prior convictions is unaffected by *Blakely*.  As the *Apprendi* court observed, prior convictions do not relate to the commission of the offense for which the defendant is being sentenced, and presumably the prior convictions "had been entered pursuant to proceedings with substantial safeguards of their own."  *Apprendi*, 530 U.S. at 488, 120 S. Ct. at 2361-62.

While not entirely clear from the record, it appears that Defendant's juvenile criminal record played as large a role in the trial court's determination as to the applicability of enhancement factor (2) as did his adult convictions. Under our sentencing act, a defendant's juvenile criminal record may be considered, but not under enhancement factor (2). The exclusive factor for enhancing a defendant's sentence for juvenile delinquent acts is enhancement factor (21). *See State v. Jackson*, 60 S.W.3d 738 (Tenn. 2001). Be that as it may, it is our view that juvenile adjudications do not qualify as "prior convictions" under *Blakely*. A juvenile adjudication of delinquency is not the equivalent of a criminal conviction under our law. One of the purposes of the juvenile justice laws is to "remove from children committing delinquent acts the taint of criminality and the consequences of criminal behavior." Tenn. Code Ann. § 37-1-101(a)(1). A juvenile adjudication in Tennessee "is not a conviction of crime." *Id.* § 37-1-133(a); *see also State v. Johnson*, 574 S.W.2d 739, 740 (Tenn. 1978). Accordingly, upon remand, the trial court's consideration of Defendant's prior convictions as a sentencing enhancement factor should be limited to his adult criminal convictions.

The State argues that *Blakely* does not impact the trial court's application of enhancement factor (10), the use of a firearm in the commission of the offense, to his attempted murder conviction because the jury convicted Defendant of especially aggravated robbery in which the use of a firearm is an essential element. In other words, the State contends that when a defendant is on trial for multiple offenses, any fact presented to the jury in support of one conviction may be used by the trial court to enhance the defendant's sentence for another conviction without running afoul of *Blakely*.

We believe, however, that this argument merely attempts to side-step the constitutional safeguards the *Blakely* court seeks to protect and undermines the long-standing rule in Tennessee that each count of an indictment is treated as a separate indictment. *State v. Wiggins,* 498 S.W.2d 92, 94 (Tenn. 1973). As the Court stated in *Blakely*,

> Our commitment to *Apprendi* in this context reflects not just respect for longstanding precedent, but the need to give intelligible content to the right of jury trial. That right is no mere procedural formality, but a fundamental reservation of power in our constitutional structure. **Just as suffrage ensures the people's ultimate control in the legislative and executive branches, jury trial is meant to ensure their control in the judiciary**.

*Blakely*, 124 S. Ct. at 2538-39 (emphasis added).

The State's argument essentially requires a court to speculate "what the jury might have done" had it been given the opportunity. Although the jury's response might seem obvious under the facts of a particular case, the *Blakely* court observed that *Apprendi* serves to "ensur[e] that the judge's authority to sentence derives wholly from the jury's verdict. Without that restriction, the jury would not exercise the control that the Framers intended." *Id.* It is clear that the focal point of *Blakely* is the constitutional right to a jury trial, and not the strength of the evidence presented to support use of a sentencing factor.

Enhancement factors (7), and (10) are not based upon Defendant's prior convictions. Accordingly, under the ruling in *Blakely*, these factors may not be applied to enhance Defendant's sentences. Using factor (2), prior adult convictions, as we are allowed to do under *Blakely*, we modify the sentence for each conviction to twenty-two years.

## IV. Consecutive Sentencing

In determining whether Defendant's sentences should be served consecutively, the trial court found that Defendant is a professional criminal who has knowingly devoted himself to criminal acts as a major source of livelihood. Tenn. Code Ann. § 40-35-115(b)(1). The trial court observed that Defendant had only held one job for a year in a fast-food restaurant. Since leaving school in the eleventh grade for "poor conduct," the trial court observed that Defendant's history showed no evidence that he had pursued any training or education that would assist him in finding a job. Moreover, the trial court found that Defendant's juvenile record consisted of numerous theft related convictions suggesting the means by which Defendant earned his livelihood.

In addition, the trial court found that Defendant is a dangerous offender with little or no regard for human life under the definition in *Gray v. State*, 538 S.W.2d 391 (Tenn. 1976). *Id.* § -115(b)(4). The trial court noted that the unarmed victim attempted to cooperate with Defendant by getting out of his car, but that Defendant continued to shoot at him.

Defendant argues that the trial court erred in classifying him as a professional criminal and as a dangerous offender for consecutive sentencing purposes. Defendant points out that all of his theft and burglary related convictions, other than the current offenses, occurred while he was a juvenile still living at home. Defendant submits, therefore, that the record does not support a finding that he earned his livelihood through his criminal conduct. Defendant also argues that the trial court failed to make the requisite findings that would support a dangerous offender classification under *State v. Wilkerson*, 905 S.W.2d 933 (Tenn. 1995).

When a defendant is convicted of multiple crimes, the trial court, in its discretion, may order the sentences to run consecutively if it finds by a preponderance of the evidence that a defendant falls into one of seven categories listed in Tennessee Code Annotated section 40-35-115. If a trial court bases its determination of consecutive sentences on the finding that Defendant is a dangerous offender, the court must make two additional findings. *State v. Imfeld*, 70 S.W.3d 698, 708 (Tenn. 2002). First, the trial court must find that an extended sentence is necessary to protect the public from further criminal conduct by Defendant, and, second, it must find consecutive sentencing to be rationally related to the severity of the offenses. *Wilkerson*, 905 S.W.2d at 939. Although such specific factual findings are unnecessary for the other categories enumerated in Tennessee Code Annotated section 40-35-115(b), the imposition of "consecutive sentencing is guided by the general sentencing principles providing that the length of a sentence be 'justly deserved in relation to the seriousness of the offense' and 'no greater than that deserved for the offense committed.'" *Imfeld*, 70 S.W.3d at 708 (quoting Tenn. Code Ann. §§ 40-35-102(1) and -103(2); *see also State v. Lane*, 3 S.W.3d 456, 461 (Tenn. 1999).

The trial court found that Defendant's sparse employment record coupled with his proclivity for committing theft and burglary related offenses supported a finding that Defendant was a professional criminal. We agree with Defendant, however, that notwithstanding his string of convictions within this genre, the evidence presented at the sentencing hearing was insufficient to support a finding that Defendant is a "professional criminal." Defendant was still a juvenile at the time of the majority of his offenses, and under the custody of either his mother or the Department of Youth Services. Although Defendant was nearly twenty-one when the current offenses were committed, there is no evidence in the record of the amount of income Defendant derived from his offenses or, that he used that income, if any, to support himself. *See State v. Desirey*, 909 S.W.2d 20 (Tenn. Crim. App. 1995).

Nonetheless, the record supports a finding that Defendant is a dangerous offender as defined in Tennessee Code Annotated section 40-35-115(a)(4). Only one of the specifically enumerated factors that support consecutive sentencing need be proven. *See id.* § 40-35-115(b). The trial court found that the unarmed victim made every effort to cooperate during the offense by relinquishing his automobile to Defendant, and that Defendant continued to shoot the victim past the point where the victim could resist even if he had chosen to do so. The circumstances surrounding the offenses indicate that Defendant has little regard for human life and has no hesitancy about committing a crime where the risk to human life is high. Defendant has persisted in engaging in the same type of criminal behavior over the years despite repeated efforts by his family and the Department of Youth Services to rehabilitate him. Moreover, Defendant has progressed from simple theft of property to especially aggravated robbery and attempted first degree murder. The violence of these offenses supports a finding that confinement is necessary to protect society from Defendant's conduct, and consecutive sentencing is reasonably related to the severity of the offenses. Tenn. Code Ann. §§ 40-35-102(1) and -103(1)(A).

Based upon the foregoing and the record as a whole, we find that the imposition of consecutive sentencing for Defendant's convictions for especially aggravated robbery and attempted first degree murder is appropriate. Defendant is not entitled to relief on this issue.

## CONCLUSION

After a thorough review of the record, we affirm Defendant's convictions for especially aggravated robbery and attempted first degree murder and the imposition of consecutive sentencing. However, we modify the sentences and impose a sentence of twenty-two years for each conviction, for a total effective sentence of forty-four years.

_____
THOMAS T. WOODALL, JUDGE