# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
June 20, 2000 Session

## STATE OF TENNESSEE v. FRANK MICHAEL VUKELICH

**Direct Appeal from the Criminal Court for Davidson County**
**No. 98-D-2423     Walter C. Kurtz, Judge**

---

**No. M1999-00618-CCA-R3-CD - Filed September 11, 2001**

---

On December 8 through December 17, 1998, Frank Vukelich, the Defendant and Appellant, was tried in the Davidson County Criminal Court for one count of conspiracy to deliver 700 pounds or more of marijuana, three counts of conspiracy to commit money laundering, and five counts of money laundering. The jury found the Defendant not guilty of one count of conspiracy to commit money laundering, but guilty on all other counts. Following a subsequent sentencing hearing, the court effectively sentenced the Defendant to thirty-four years of incarceration and ordered the Defendant to pay fines totaling $180,000. After a hearing regarding the Defendant's motion for new trial, however, the trial court dismissed four money laundering counts. The Defendant appeals here, arguing; (1) that the trial court erroneously allowed the consolidation of indictments; (2) that although the trial court correctly dismissed four money-laundering counts, the trial court erred by refusing to dismiss the counts prior to trial, thus prejudicing the Defendant; (3) that the trial court erroneously denied the Defendant's motion to suppress the fruits of two search warrants executed at the Defendant's home; (4) that the Defendant's confrontation rights were violated by the introduction of hearsay at trial; (5) that the trial court erroneously refused to grant a mistrial; (6) that the trial court erroneously allowed the introduction of prior acts of the Defendant at trial; and (7) that his sentence is excessive. The State also appeals here, arguing that the trial court's dismissal of the four money-laundering counts was erroneous. After a review of the record, we hold that the trial court erroneously dismissed the four money laundering counts, and those counts must be reinstated. As to the Defendant's claims, we find no merit. Accordingly, the judgment of the trial court is affirmed in part and reversed in part.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed in Part and Reversed in Part.**

JERRY L. SMITH, J., delivered the opinion of the court, in which DAVID H. WELLES and JOHN EVERETT WILLIAMS, JJ., joined.

Peter J. Strianse, Nashville, Tennessee, for appellant, Frank Michael Vukelich.

Paul G. Summers, Attorney General & Reporter; David H. Findley, Assistant Attorney General; Victor S. Johnson, District Attorney General; and John Zimmermann, Assistant District Attorney, for appellee, State of Tennessee.

**OPINION**

**Factual Background**

In November of 1989, the Metropolitan Nashville Police Department was investigating the Defendant, the owner and operator of a tour-bus company, for drug trafficking. In 1991, Police Sergeant James McWright received information from a confidential informant that Randy McCool was transporting drugs in a slate-colored Honda Accord. Sergeant McWright was familiar with Mr. McCool. As a result of the information, Sergeant McWright stopped Mr. McCool in a car matching the above description in Dickson, Tennessee. Sergeant McWright proceeded to search Mr. McCool's vehicle, which had an Oklahoma license plate, and found $135,000 in cash hidden inside a door panel. Mr. McCool also had an Oklahoma driver's license. As a result of the stop, Mr. McCool began cooperating with police. Mr. McCool told police that, at the Defendant's direction, he had been delivering money from either the Defendant or James Eason, who lived on a farm in Santa Fe, Tennessee, to someone in Arizona where he would pick up large amounts of marijuana and bring it back to either the Defendant or James Eason, both of whom were in Tennessee, or deliver it to Gary Jones in Fort Lauderdale, Florida. Mr. McCool also told police that the money that police discovered in his car had been loaded into his vehicle at Mr. Eason's farm.

Based on that information, police obtained a search warrant for Mr. Eason's farm. When they searched Mr. Eason's farm, police found large scales, at least $35,000 in cash, fifty pounds of marijuana and an all-terrain vehicle registered to the Defendant. Mr. Eason later confirmed that the scales, the all-terrain vehicle and the marijuana were placed there by the Defendant. Mr. Eason also confirmed that the Defendant knew Gary Jones.

Mr. McCool testified that the Defendant instructed him to purchase a houseboat for the Defendant. The Defendant and Mr. McCool went to look at the houseboat together, and the Defendant subsequently gave Mr. McCool $24,000 in cash with which to purchase the boat from Dan Sizemore. Mr. Sizemore confirmed that the Defendant and Mr. McCool had looked at the boat together and that Mr. McCool ultimately purchased the boat for $24,000 in cash. Mr. Sizemore also testified that the Defendant later complained that the boat had broken down.

Furthermore, Mr. McCool testified that he and the Defendant were partners in a Haunted House business. When dividing their profits from this partnership, Mr. McCool stated that he would give his share of the cash profits to the Defendant in small bills so the Defendant could deposit that money into his own bank account, and the Defendant, in turn, would repay Mr. McCool with large bills.

Subsequently, in 1996, Officer Perry Buck of the Metropolitan Nashville Police Department received information from a confidential informant that Tommy Rippy was about to receive a large shipment of marijuana. The informant told police that the marijuana would arrive in a fifth-wheel trailer attached to a light-colored truck with Colorado license tags. On October 24, 1996, police saw a truck matching the description given by the informant arrive at Mr. Rippy's home. Instead of a

fifth-wheel trailer, however, the truck was pulling a flat-bed trailer. Officer Buck met with the informant again, and, as a result, recommenced surveillance of Mr. Rippy. On December 4, 1996, Officer Buck and other officers saw the light-colored truck arrive at Mr. Rippy's home again.

Based on that information, police obtained a search warrant of Mr. Rippy's home early the next morning. During the search, police found over 500 pounds of marijuana. Tommy Rippy immediately indicated that he wanted to cooperate with police. Mr. Rippy subsequently informed police that he sold drugs for the Defendant and that Gary Corn was a drug courier who would deliver marijuana at the Defendant's direction. Mr. Rippy said that Mr. Corn would usually drive to Tuscon, Arizona to exchange money for marijuana and return to Nashville or Fort Lauderdale. While Mr. Corn was acting as a courier, he would report to Mr. Rippy, who in turn would report to the Defendant.

Mr. Rippy testified that, at the Defendant's direction, he purchased a Coachman travel trailer to haul marijuana. He also testified that the Defendant accompanied him to buy the trailer. Thomas Payne, who sold Mr. Rippy the trailer, verified Mr. Rippy's testimony and said that Mr. Rippy paid $15,000 cash for the trailer. Mr. Rippy also testified that Mr. Corn later bought a light-colored pickup truck and that the Defendant picked the color so that the pickup would not be noticeable on the highway. After its purchase, a fifth-wheel trailer hitch was apparently installed on the truck. However, at some point, the Defendant borrowed the truck, and when he returned it to Mr. Rippy, the trailer hitch was missing. Later, another truck was purchased to transport marijuana, and a bed-liner was installed at the Defendant's direction. Mr. Rippy paid for the bed-liner using funds that he owed the Defendant for drugs. Mr. Rippy testified that they stopped using the trailer, and the Defendant ordered that the trailer be taken to Eagle's Nest Busworks, a bus repair company.

Mr. Rippy agreed to call the Defendant regarding the Coachman trailer while wearing a recording device. However, when Mr. Rippy spoke to the Defendant about the trailer, the Defendant denied any knowledge of it.

Clarence Huffman testified that, in 1996, he sold the Defendant a burgundy 1993 Chevrolet pickup truck for $13,000. At the Defendant's direction, Mr. Huffman made out a bill of sale for $8,300 because that was the amount that Mr. Huffman owed on the truck when he sold it. Also at the Defendant's direction, Mr. Huffman did not write in the name of the buyer, because the Defendant claimed to be acting as a broker for someone else who wanted to buy the truck, and this buyer apparently wanted to title the truck in Alabama. At trial, Mr. Huffman identified the bill of sale, but noted that the name "Raul Enrique Matus" was written as the buyer some time after Mr. Huffman gave the Defendant the bill of sale.

Later, the Defendant told Mr. Huffman that he (the Defendant) might be under investigation, and he told Mr. Huffman that if anyone asked, Mr. Huffman should tell them that he sold the truck to a Mexican. Federal agents eventually approached Mr. Huffman. Mr. Huffman originally told the agents that he sold the truck to a Mexican, but after consulting with his attorney, he told the agents the truth the next day.

The parties stipulated that on September 23, 1996, co-defendant Raul Enrique Matus flew from Phoenix, Arizona to Nashville and stayed at a Ramada Inn in Nashville. Denise Francis testified that, in the fall of 1996, Raul Matus rented an apartment in Decatur, Alabama, but moved out one month later. Finally, Louisiana State Police Officer Don Campbell testified that on December 10, 1996, he pulled over Mr. Matus in the 1993 maroon Chevrolet pickup truck for a

traffic violation. Upon further inspection, Officer Campbell found that the truck was loaded with bundles of marijuana.

Gary Corn also testified against the Defendant, and verified much of Mr. Rippy's testimony. For example, Mr. Corn, who was formerly an employee of Mr. Rippy, testifed that Mr. Rippy asked him to transport drugs for the Defendant. Soon after that, Mr. Corn began making trips to Arizona to exchange cash for marijuana using a map that Mr. Rippy said had been provided by the Defendant. At Mr. Rippy's direction, Mr. Corn bought a truck and a fifth-wheel trailer in which to haul the marijuana. Also at Mr. Rippy's direction, Mr. Corn eventually parked the trailer at the Eagle's Nest. He also bought a bed-liner and modified both trucks to transport marijuana more effectively. When Mr. Corn was traveling, he communicated with Mr. Rippy by telephone.

Mr. Corn admitted that although Mr. Rippy told him that the Defendant was overseeing the drug operation, Mr. Corn never saw the Defendant involved in or spoke to him about the drug operation. However, the Defendant called Mr. Corn once, and asked him how to remove a trailer hitch from the truck.

During their investigation of the Defendant, police searched through the Defendant's trash after it had been picked up. In the trash, police found a picture of the Defendant with Gary Jones. Earlier in the investigation, police also found a copy of a rental agreement that indicated that the Defendant and Gary Jones were lessees of a house together in Tuscon, Arizona from November, 1988 until May, 1989.

Following the above investigation, police obtained a search warrant for the Defendant's home on Jones Parkway on April 16, 1997. When they executed the warrant, police found a trailer-hitch. They also found seven-hundred and twenty-four $20 bills, fifty $10 bills, and three $100 bills, some of which were cut in half. Police later obtained a second search warrant for the Defendant's home, executed the warrant and arrested the Defendant on March 2, 1998.

Investigators eventually learned that the Defendant was involved in several money-laundering schemes. Bob Williams testified that he co-signed for a loan to buy a tour bus in 1989. After his partner defaulted on the loan, however, Mr. Williams was introduced to the Defendant, who offered to buy the bus from Mr. Williams. Several times, the Defendant gave Mr. Williams large sums of cash, and Mr. Williams bought cashier's checks with the cash. Then, the cashier's checks were used to pay off the loan. Mr. Williams also signed a document purporting to loan money to the Defendant's bus company, of which Mr. Williams became an officer; however, Mr. Williams testified that he never actually loaned the company any money. Instead, Mr. Williams merely pretended to loan the company money, and the Defendant gave Mr. Williams several checks for the purpose of paying back the "loan." Mr. Williams cashed the checks and gave the money back to the Defendant.

In 1995, the Defendant approached Mr. Keith Schumacher, a home builder in Brentwood, and offered to buy a home that Mr. Schumacher, was building. Mr. Schumacher testified that the Defendant offered to pay him $480,000 for the home along with $65,000 cash. Mr. Schumacher agreed, and they signed a written contract to purchase the home for $480,000. Mr. Schumacher also had a separate contract drawn to memorialize the $65,000, even though the money was "under the table," or illegal. The Defendant eventually had Mr. Schumacher add $15,000 in additions to the home, so he ultimately paid Mr. Schumacher $80,000 in cash. The Defendant also gave Mr. Schumacher a $30,000 check as a down payment.

Mr. Schumacher also testified that he subsequently gave the Defendant four checks, totaling $105,000, in exchange for cash. Although Mr. Schumacher also signed contracts that purported to show that the Defendant received the checks for consulting work, Mr. Schumacher testified that the Defendant never actually performed the work. When Mr. Schumacher discovered that the Defendant was the subject of a criminal investigation, he gave some of the cash to a friend named Wayne Kabanuk and instructed Mr. Kabanuk to distribute the money to charity. Mr. Kabanuk corroborated this testimony.

The Defendant was originally indicted on January 1, 1998 for one count of conspiracy to deliver over 700 pounds of marijuana between February 1988 and December 1996 in violation of Tennessee Code Annotated section 39-17-417 and for three counts of money-laundering. On May 22, 1998, the trial court dismissed the original indictment, and the Davidson County Grand Jury returned a superceding indictment, charging the Defendant with one count of conspiracy to deliver over 700 pounds of marijuana between February, 1988 and December, 1996, and with six counts of money-laundering. Apparently realizing that the conspiracy count encompassed criminal activity that occurred before section 39-17-417 was passed in November, 1989, the State indicted the Defendant again on July 14, 1998. In this second superceding indictment, the State essentially split the first count of the prior indictment into two parts; thus, this second superceding indictment contained one count of conspiracy to deliver over 700 pounds of marijuana between November, 1989 and December, 1996 in violation of section 39-17-417, one count of conspiracy to deliver over 70 pounds of marijuana between February 1988 and October 1989 in violation of Tennessee Code Annotated section 39-6-417 (repealed, Nov. 1, 1989), and six money-laundering offenses. The trial court dismissed the second count (conspiracy to deliver over 70 pounds of marijuana) due to the statute of limitations. A subsequent jury trial on the remaining counts resulted in a mistrial due to a hung jury. During that trial, Keith Schmacher testified about several instances in which the Defendant laundered money by giving Mr. Schumacher cash for checks. The State then indicted the Defendant again, attempting to cure the statute of limitations problem by indicting the Defendant for one count of conspiracy to deliver over 700 pounds of marijuana between February 1988 and December 1996 in violation of section 39-17-417 and for eight counts of money-laundering. This new indictment included four new charges which arose from Mr. Schumacher's testimony. The Defendant moved to dismiss count one, arguing that section 39-17-417, which was not in effect until November 1, 1989, should not apply retroactively to activity conducted prior to that date. The trial court agreed and dismissed the count, but apparently suggested that the State substitute count one from the second superceding indictment (conspiracy to deliver over 700 pounds of marijuana between November 1989 and December 1996) because it did not reference any activity before November 1989. Following the court's suggestion, the State moved for consolidation of the indictments, and the court granted the State's motion. Thus, the final indictment consisted of count one of the second superceding indictment and counts two through nine of the third superceding indictment. Following a subsequent jury trial, the Defendant was convicted on all counts except count two, a money-laundering charge, for which he was found not guilty.

Following a sentencing hearing, the trial court sentenced the Defendant to serve twenty years for count one, conspiracy to deliver over 700 pounds of marijuana; four years each for counts three and four, conspiracy to commit money laundering; and ten years each for counts five, six, seven, eight and nine, all money laundering. The court also ordered the sentences for counts three and four

to be served concurrently to each other, but consecutively to the sentence for count one, and the sentences for the remaining counts to be served concurrently to each other, but consecutive to counts one and three, for a total effective sentence of thirty-four years. The court also imposed a total of $180,000 in fines on the Defendant.

Following the Defendant's motion for a new trial, the trial court dismissed the four additional money-laundering counts, holding that the addition of counts following a mistrial violated Rule 8 of the Tennessee Rules of Criminal Procedure. Thus, the Defendant's effective sentence remained thirty-four years, but his fines were reduced to $160,000.

## Permissive Consolidation of Indictments

The Defendant claims that the trial court improperly constructed a "hybrid" indictment by consolidating one count from one indictment and eight other counts from a subsequent indictment. Thus, the Defendant claims that the trial court deprived him of his constitutional right to have his case presented to a grand jury. We disagree.

Under article I section 14 of the Tennessee Consitution, "no person shall be put to answer any criminal charge but by presentment, indictment, or impeachment." There is also an absolute right to a criminal accusation by a grand jury that applies to all crimes except those involving a fine of $50.00 or less. State v. Brackett, 869 S.W.2d 936, 938 (Tenn. Crim. App. 1993) (citing Capitol News Co., Inc. v. Metro Gov't of Nashville and Davidson Co., 562 S.W.2d 430 (Tenn. 1978)). Validly constituted grand juries returned each count against the Defendant. The Defendant has not demonstrated that he was denied his right to an accusation by a grand jury, because count one of the final, so-called "hybrid" indictment was validly returned by the grand jury that returned the second superceding indictment, and counts two through nine were validly returned by a subsequent grand jury.

Nor did the trial court err in consolidating the indictments. We review decisions concerning consolidation of indictments under an abuse of discretion standard. Spicer v. State, 12 S.W.3d 438, 443 (Tenn. 2000); State v. Shirley, 6 S.W.3d 243, 247 (Tenn. 1999). As such, a trial court's decision to consolidate or sever offenses will not be reversed unless the "court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." State v. Shuck, 953 S.W.2d 662, 669 (Tenn. 1997).

Rule 13 of the Tennessee Rules of Criminal Procedure, which governs consolidation of indictments, provides, in pertinent part, "[t]he court may order consolidation of two or more indictments, presentments, or informations for trial if the offenses and all defendants could have been joined in a single indictment, presentment, or information pursuant to Rule 8 [of the Tennessee Rules of Criminal Procedure]." Tenn. R. Crim. P. 13(a). Thus, we must determine whether the offenses could have been joined in a single indictment under Rule 8.

Rule 8(b) of the Tennessee Rules of Criminal Procedure provides, in pertinent part:

> Two or more offenses may be joined in the same indictment, presentment, or information, with each offense stated in a separate count, or consolidated pursuant to Rule 13 if the offenses constitute part of a common scheme or plan or if they are of the same or similar character.

Tenn. R. Crim. P. 8(b). In this case, the Defendant was essentially charged with conspiracy to deliver a large amount of marijuana and subsequent laundering of the proceeds in several different ways. For consolidation purposes, we consider all of the counts to be "part of a common scheme or plan . . ." to distribute marijuana and launder the proceeds. Thus, the consolidation of indictments was proper in this case. See id.

The Defendant also argues that the trial court erroneously amended count one of the second superceding indictment (which became count one of the final indictment) to excise the names of unindicted coconspirators. The trial court amended the indictment prior to the first trial, and the amended count remained excised when the trial court consolidated it with the third superceding indictment before the second trial. The Defendant claims that this amendment "altered the nature of the conspiracy, as it was presented to the Grand Jury [and thus] substantially prejudiced the Defendant." However, the Defendant has waived this issue by failing to provide an adequate record for this Court's review. Although the Defendant claims that "the technical record is sufficient to preserve the issue[,]" we respectfully disagree; the record before us merely contains a one-sentence order by the trial court granting the State's motion to amend the indictment prior to the first trial and the Defendant's motion to reconsider that order. Thus, we are unable to determine how and why count one was amended. It is the defendant's responsibility to include a complete record on appeal. See State v. Troutman, 979 S.W.2d 271, 274 (Tenn. 1998); State v. Oody, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991). Failure to do so precludes our review. Tenn. R. App. P. 24(b). This issue is without merit.

## Additional Counts

The Defendant claims that the trial court erred by allowing the State to add four additional counts of money laundering to the third superceding indictment following the Defendant's first trial. During the first trial, state witness Keith Schumacher testified that he helped the Defendant launder money by giving the Defendant checks in exchange for cash. Although in the first trial the testimony was offered as proof of the conspiracy, the third superceding indictment, which was returned after the first trial ended in a mistrial, charged that cashing each check was a separate money-laundering offense. The Defendant moved to dismiss the four additional counts, arguing (1) that the four additional counts were the result of prosecutorial vindictiveness and (2) that Rule 8(a) of the Tennessee Rules of Criminal Procedure barred the addition of counts arising from the same conspiracy. Following a hearing, the trial court denied the Defendant's motion. After the second trial, the Defendant was convicted of the additional counts. Following the Defendant's argument at a hearing regarding the Defendant's motion for new trial, the trial court reconsidered and, citing an unpublished Court of Criminal Appeals decision, dismissed the four additional money laundering counts, finding that they violated Rule 8 of the Tennessee Rules of Criminal Procedure. On appeal, the Defendant claims (1) that the addition of the counts was a result of prosecutorial vindictiveness; (2) that the trial court correctly dismissed the counts, but should have done so prior to trial; and (3) that the Defendant was prejudiced as a result of the trial court's initial ruling, because the jury was presented with a much larger indictment and was thus more likely to convict the Defendant. The State responds (1) that the additional counts were not the result of prosecutorial vindictiveness, because they were based on newly discovered evidence; (2) that the trial court erred when it

ultimately dismissed the four additional counts, because its decision was based on an unpublished decision of this Court that should be overturned; and (3) that in any event, the Defendant was not prejudiced by the additional counts, as evidenced by the jury's "not guilty" verdict returned on count two of the final indictment.

## A. Prosecutorial Vindictiveness

The Defendant argues that the addition of the four additional money laundering counts was erroneous. He argues that a presumption of "prosecutorial vindictiveness" applies to the State's addition of money laundering counts. At a hearing on the Defendant's motion to dismiss the additional money-laundering counts, the Defendant argued that his due process rights were violated because the additional counts were the result of prosecutorial vindictiveness. Following the hearing, the trial court issued an order that relied on United States v. Goodwin, 457 U.S. 368, 102 S. Ct 2485, 73 L. Ed. 2d 74 (1982). Goodwin drew a distinction between pre-trial and post-trial initiation of additional charges, and held that in a pre-trial setting, the Defendant must offer proof of prosecutorial vindictiveness. Goodwin, 457 U.S. at 382. In this case, the trial court found that initiation of additional charges following the mistrial was more closely analogous to a pre-trial setting than a post-trial one and, thus, that the presumption of prosecutorial vindictiveness did not apply. Finding no other objective proof of bad faith on the part of the prosecutor, the court denied the Defendant's motion.

We need not decide whether the initiation of additional charges following the mistrial was in a pre-trial or a post-trial procedural posture, because "a rebuttable presumption of prosecutorial vindictiveness may arise if the circumstances of a case pose a 'realistic likelihood' of prosecutorial retaliation." State v. Phipps, 959 S.W.2d 538, 546 (Tenn. 1997). Thus, the relevant question for an appellate court is not the timing of the new charges, but whether a "realistic likelihood" of prosecutorial retaliation existed. As the Tennessee Supreme Court stated,

> In assessing whether a "realistic likelihood" of prosecutorial retaliation exists, courts must consider whether the right asserted by the defendant would result in duplicative expenditures of prosecutorial resources, or require the State to do over again what it thought it had already done correctly once. Goodwin, 457 U.S at 383[]. When the circumstances demonstrate that the prosecutor has "a personal stake" or an interest in self vindication, or when institutional biases militate against retrial of a decided question, the balance weighs in favor of recognizing the presumption. Id. Likewise the presumption is especially warranted if the prosecutorial decision to increase the charge or sentence is made after an initial trial is completed rather than in a pretrial context. When application of these factors to the circumstances of a case reveal the existence of a realistic likelihood of prosecutorial retaliation, [the presumption of prosecutorial vindictiveness announced in North Carolina v.] Pearce applies.

Id. The circumstances of this case do not indicate that the prosecutor had an interest in self-vindication, and no institutional biases militated against retrial of a decided question, because the Defendant was to be tried again anyway. Furthermore, although the decision to add the money

laundering counts came following the first trial, that trial was not "completed" because it resulted in a mistrial. Thus, we find that the presumption of prosecutorial vindictiveness does not apply here.

Even, assuming arguendo, that the presumption applied, the State overcame the presumption. "Once the presumption of vindictiveness has been raised, the burden shifts to the State to rebut it by presenting clear and convincing evidence which demonstrates that the prosecutor's decision was motivated by a legitimate purpose." Id. (citations omitted). After the first trial, Assistant District Attorney John Zimmerman filed an affidavit in which he claimed that, although he had knowledge of Keith Schumacher's allegations prior to the first trial, he believed that he could not prosecute the Defendant solely on the basis of Mr. Schmacher's testimony, because Mr. Schumacher was an accomplice whose testimony could not be corroborated.[1] During cross-examination of Mr. Schumacher, however, Mr. Schumacher revealed certain details that he had not previously revealed before.[2] Those details led to further investigation that, in turn, led to the new money laundering counts. Investigating Officer Ed Rigsby filed a similar affidavit that detailed this resulting investigation. These uncontradicted affidavits provide clear and convincing evidence that the prosecutor did not act vindictively.

### B. Mandatory Joinder

Prior to the second trial, the Defendant also moved to dismiss the four additional money laundering counts because they violated Rule 8(a) of the Tennessee Rules of Criminal Procedure. The trial court denied the Defendant's motion, and the Defendant was ultimately tried and convicted for those four counts. Following the Defendant's motion for new trial, however, the trial court reversed its position and granted the Defendant's motion, citing State v. Luther E. Fowler, No. 03C01-9207-CR-00249, 1993 WL 278468 at *1 (Tenn. Crim. App. at Knoxville, Jul. 27, 1993). The trial court held that Luther E. Fowler stood for the proposition that Rule 8(a) of the Tennessee Rules of Criminal Procedure, which governs the mandatory joinder of offenses, prevents indictment following a mistrial for additional offenses that arose from the same criminal episode for which the Defendant was originally tried when the evidence which gave rise to the additional counts was known to the prosecutor prior to the first trial. On appeal, the Defendant agrees with the trial court's ruling, but argues that it should have dismissed the four additional counts prior to trial. Additionally, the Defendant argues that by waiting to dismiss those counts until after the Defendant was tried for and convicted of those counts, the court prejudiced him by presenting the jury with an indictment almost twice as large as it should have been. The State also appeals this issue, but argues that the reasoning in Luther E. Fowler is misguided and that the Defendant's convictions on the four additional counts should be reinstated by this Court.

Rule 8(a) of the Tennessee Rules of Criminal Procedure provides, in pertinent part,

---

[1] In Tennessee the testimony of an accomplice must be corroborated if it is to form the basis of a valid criminal conviction. State v. Bigbee, 885 S.W.2d 797 (Tenn. 1994).

[2] The Defendant claims that the additional counts were impermissibly based on a mere "reassessment" of the evidence. However, the State argues that Mr. Schmacher's testimony led to new corroborative evidence, and was not a mere reassessment of evidence already in the possession of the State.

> Two or more offenses shall be joined in the same indictment, presentment, or information, with each offense stated in a separate count, or consolidated pursuant to Rule 13 if the offenses are based upon the same conduct or arise from the same criminal episode and if such offenses are known to the appropriate prosecuting official at the time of the return of the indictment(s), presentment(s), or information(s) and if they are within the jurisdiction of a single court. A defendant shall not be subject to separate trials for multiple offenses falling within this subsection unless they are severed pursuant to Rule 14.

Tenn. R. Crim. P. 8(a). The Advisory Commission Comments to Rule 8 further provide, in pertinent part,

> This rule is designed to encourage the disposition in a single trial of multiple offenses arising from the same conduct and from the same criminal episode, and should therefore promote efficiency and economy. Where such joinder of offenses might give rise to an injustice, Rule 14(b)(2) allows the trial court to relax the rule.
>
> The Commission wishes to make clear that section (a) is meant to stop the practice by some prosecuting attorneys of "saving back" one or more charges arising from the same conduct or from the same criminal episode. Such other charges are barred from future prosecution if known to the appropriate prosecuting official at the time that the other prosecution is commenced, but deliberately not presented to a grand jury.

Tenn. R. Crim. P. (8), Advisory Commission Comments.

This court has been somewhat inconsistent in defining the scope of the rule. In State v. King, 717 S.W.2d 306 (Tenn. Crim. App. 1986), the state attempted to prosecute the defendant by a second indictment for an offense subject to mandatory joinder with an offense that had been prosecuted in a prior trial. Id. at 307. Following appeal, this Court held that the second indictment was barred by Rule 8(a). In reaching this result, the court held "[a] subsequent indictment is permitted after the defendant has been tried on the first charge when (1) the subsequent offense is not known to the District Attorney General at the time of the return of the indictment upon which the defendant was tried, or (2) if the second charge is not within the jurisdiction of the same court that tried the defendant." Id. at 308. Then the court, in dictum, stated,

> [w]e do not perceive that any evil results from subsequent indictments being returned against a defendant charging him with additional offenses which are based on the same conduct or which arise from the same criminal episode upon which prior indictments have been returned; when the defendant has not been tried on any of the offenses at the time the subsequent indictments are returned. As previously noted, the purpose of Rule 8 is to prevent multiple trials on charges arising from the same conduct or from the same criminal episode except under the circumstances stated in the rule.

Id.

More recently, the Tennessee Supreme Court adopted a portion of this Court's opinion in State v. Carruthers, 35 S.W.3d 516, 573 (Tenn. 2000) that interpreted Rule 8(a) by relying on the above dictum in King. In that case, the defendant was indicted first for three counts of first-degree murder and later, in a separate indictment, for three counts of especially aggravated kidnapping and one count of especially aggravated robbery. Id. at 572. All of the offenses arose from the same criminal episode and involved the same three victims. Id. The defendant appealed, arguing that the murder charges should have been dismissed pursuant to Rule 8. Id. This Court held, and the supreme court adopted the holding, as follows:

> [The Defendant's] argument ignores the basic premise behind the Rule. The purpose of Rule 8 is to promote efficient administration of justice and to protect the rights of the accused. The rule clearly permits a subsequently returned indictment to be joined with a previous indictment where the alleged offenses relate to the same criminal episode. This practice, however, does have certain limitations that, as the comments note, safeguard an accused against prosecutorial abuse. For example, a prosecutor cannot simply decide to "save" charges on other offenses arising out of the same conduct until after a trial is had on the original charges. Obviously, this would result in multiple trials and prejudice the defendant. This concern, however, is not present in the case at hand because the subsequent indictments were returned well before the start of trial.

Id. at 573. (citations omitted)

In State v. Luther E. Fowler, 1993 WL 273468, an unpublished case, a divided panel of this Court found that Rule 8 was violated when the State brought additional charges after the Defendant had been prosecuted for other charges arising from the same conduct, but that prosecution resulted in a mistrial. Id. at *6 - *8. One judge dissented, finding that since the mistrial necessitated a new trial on the original charges anyway the evil that Rule 8 was designed to prevent, i.e., multiple trials necessitated by the new charges, was not present. Id. at *8 - *9 (Peay, J., dissenting).

We believe that Carruthers and King stand for the proposition that the purpose of Rule 8 is to prevent multiple trials necessitated by the prosecutor's "holding back" of charges arising out of the same conduct for which other charges have been prosecuted to completion. That evil is not present here, and we respectfully disagree with this Court's holding to the contrary in State v. Luther E. Fowler, 1993 WL 278468, at *6 - *8. In the instant case the defendant's first trial ended with a hung jury thereby necessitating a second trial on the original charges whether the new charges were brought, or not. Following a mistrial where a new trial on the original charges will be held in any event, we do not believe Rule 8 is implicated. See, State v. Luther E. Fowler, 1993 WL 278468, at *8 (Peay, J. dissenting); People v. Quigley, 697 N.E.2d 735, 739 (Ill. 1998); (holding that mandatory joinder is not applicable in cases of mistrial). Therefore, it was error for the trial court to dismiss the four money laundering counts in question, and we therefore reverse that decision. Because of this holding we need not address the defendant's argument that the initial inclusion of these counts in the indictment prejudiced him.

**Search Warrants**

Next, the Defendant argues that the affidavits supporting the April 16, 1997 and March 2, 1998 search warrants of the Defendant's home failed to provide a sufficient nexus between the crimes committed and the place to be searched. We disagree.

In State v. Longstreet, the Tennessee Supreme Court, quoting the Court of Criminal Appeals' opinion in the same case, said that "facts providing a nexus between the crime and the [place] to be searched are a critical element that must be included in the affidavit." 619 S.W.2d 97, 99 (Tenn. 1981) (citing Whiteley v. Warden, 401 U.S. 560, 565-66, 91 S. Ct. 1031, 28 L. Ed. 2d 306 (1971)). In other words, "[t]he police may have absolute proof that the defendant sold drugs on a street corner, for example, but officers cannot search the home of the defendant for drugs without some information that the drugs are in the defendant's home." David L. Raybin, Tennessee Criminal Practice and Procedure § 18.70. However, the supreme court later clarified that the required nexus between the crime and the place to be searched "may be established by the type of crime, the nature of the items, and the normal inferences where a criminal would hide evidence," as long as those inferences are based on facts set forth in the affidavit supporting the warrant. State v. Smith, 868 S.W.2d 561, 572 (Tenn. 1993).

For example, in Smith, the defendant became a prime suspect in the murder of his estranged wife and her two sons. Id. at 566-67. After obtaining a search warrant, the police searched the defendant's home for the weapons used in the slayings and any clothing worn the night of the murder. Id. at 571. On appeal, the defendant objected to the search, contending that the affidavit failed to establish probable cause because it did not show a nexus between the evidence sought and the place to be searched. Id. at 572. The supreme court rejected Smith's argument, stating that "[t]he items being sought, murder weapons such as a gun and ice pick/awl, clothing worn the night of the killing . . . were of the type kept at one's residence. It was reasonable to conclude that personal items such as these would have been left at Defendant's trailer and would remain there." Id.; see also State v. Lewis, 641 S.W.2d 517, 520 (Tenn. Crim. App. 1982) (stating that, when the affidavit establishes that the amount of contraband in question is large, it is reasonable to infer that the contraband is located at the defendant's residence.)

Moreover, "it is commonly held that [the requisite nexus may be established] merely on the basis of the affiant-officer's experience that drug dealers ordinarily keep their supply, records and monetary profits at home." Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 3.7(d), at 378 (3d ed. 1996 & Supp. 2001) (citing, inter alia, United States v. Feliz, 182 F.3d 82 (1st Cir. 1999) (stating that, where an affidavit established defendant as a "long-time, successful drug trafficker," the warrant was properly based on affiant-officer's "experience in drug trafficking cases and his opinions regarding the habits of drug traffickers with regard to the retention of drug trafficking proceeds and records."); United States v. Reddrick, 90 F.3d 1276 (7th Cir. 1996) (stating that a magistrate can infer that "in the case of drug dealers, evidence is likely to be found where dealers live"); United States v. Emmons, 24 F.3d 1210 (10th Cir. 1994)(stating that due to the large marijuana cultivation in woods adjacent to defendant's home, it was reasonable to issue a search warrant based upon the conclusion that the defendant was involved in drug trafficking, a conclusion predicated upon the affiant officer's training and experience, which indicated that distributors keep records, packaging and assets at home)).

In this case, the two affidavits in question, which were substantially identical, detailed an extensive investigation of the defendant that lasted several years. The affidavits reveal, among other things, (1) that several sources informed police that the Defendant had been a large-scale marijuana dealer for several years; (2) that police had previously seized marijuana and paraphernalia from another residence belonging to the Defendant and approximately $85,000 in cash from a car belonging to the Defendant; (3) that the Defendant was using various businesses to launder the proceeds from his drug-dealing operation; (4) that the affiant-officer had extensive experience in the investigation of narcotics trafficking; and (5) that the affiant-officer's experience led him to believe that drug dealers often kept contraband, records and money at their residences. Based on the officer's experience and the amount of contraband likely at issue, we find a sufficient nexus between the criminality and the Defendant's residence. This issue is without merit.

**Confrontation**

Next, the Defendant claims that he was denied his constitutional rights to confront a witness. Specifically, the Defendant complains that the State elicited testimony from Officer Perry Buck that a confidential informant had told Officer Buck that the Defendant was involved in drug-dealing. The State responds (1) that the Defendant "opened the door" to Officer Buck's testimony by cross-examining Officer Buck about the confidential informant, (2) that Officer Buck's statements were not hearsay, and, alternatively, (3) that the admission of hearsay was harmless error.

During the Defendant's cross-examination of Officer Buck, the following colloquy occurred:

MR. STRIANSE [Defense Counsel]: Now in advance of this raid that you conducted on December 5, 1996 out at Mr. Rippy's place on Vantrease, I think you'd agree that you received some remarkably specific informant information.

OFFICER BUCK: Yes, sir.

MR. STRIANSE: How many years have you been a police officer?

OFFICER BUCK: Twenty-two.

MR. STRIANSE: Twenty-two years. Would you say that it's pretty unusual to receive the kind of specific information that you had in advance of that raid on December 5, '96?

OFFICER BUCK: Yes, sir.

MR. STRIANSE: Because you pretty much had a cliff note version of the Rippy/Corn organization well in advance of December 5, '96?

OFFICER BUCK: Yes, sir.

MR. STRIANSE: You knew from this informant that Mr. Rippy supposedly had a right-hand man named Corn, correct?

OFFICER BUCK: Correct.

MR. STRIANSE: And these trips out west were being made with a light-colored truck, correct?

OFFICER BUCK: Correct.

MR. STRIANSE: This truck had Colorado tags?

OFFICER BUCK: Correct.

MR. STRIANSE: These people, Corn and Rippy, were using a fifth-wheel trailer to haul marijuana?

OFFICER BUCK: Correct.

MR. STRIANSE: That marijuana was stored in the bathroom?

OFFICER BUCK: Correct.

MR. STRIANSE: That Mr. Corn would even have his wife with him on his December trip, is that right?

OFFICER BUCK: Correct.

MR. STRIANSE: And that Corn had a Colorado driver's license?

OFFICER BUCK: Correct.

MR. STRIANSE: And that Corn, when he wasn't using the pickup truck, would avail himself of renting cars from the state of Colorado.

OFFICER BUCK: Correct.

MR. STRIANSE: So that is some really specific detail, would you agree?

OFFICER BUCK: Yes, sir.

MR. STRIANSE: Indicative of somebody being on the inside who's giving that information - -

-14-

OFFICER BUCK: Correct.

The State never objected to this testimony. Subsequently, on re-direct examination, the following colloquy occurred:

> MR. ZIMMERMAN [Prosecutor]: Next Mr. Strianse asked you about these matters, the very particular and specific information that this informant provided you prior to the raid on Rippy's house that night. Did he tell you anything about Vukelich's role in this organization?
>
> OFFICER BUCK: This is on December 5th?
>
> MR. ZIMMERMAN: No. I'm talking about the information you got from the informant.
>
> OFFICER BUCK: Oh, yes.
>
> MR. ZIMMERMAN: What did he tell you his role was?
>
> OFFICER BUCK: The informant told us that - -
>
> MR. STRIANSE: Your Honor, unless they're going to produce the informant this would be hearsay.
>
> MR. ZIMMERMAN: They've opened the door to this, Judge. He's asked him about the information - -
>
> THE COURT: Excuse me. Approach the bench.

Following a bench conference, the trial court overruled the Defendant's objection, holding that the Defendant had "opened the door" by questioning the witness about the informant and that the "rule of completeness" required that the prosecutor be allowed to ask the question. Subsequently, the witness answered the question as follows:

> OFFICER BUCK: Our informant said that Vukelich was the money man. Said he had the Mexican connection. And he told us, as did Rippy, about the system that they would use where Corn would drive out of state. Go to a motel. He'd call back to Rippy. Tell Rippy where he was at. Rippy, in essence, would call Vukelich, Mr. Vukelich. And Mr. Vukelich would call the Mexican connection. And at some point this gold truck or the light-colored truck would disappear and when it reappeared it would be full of marijuana. He also told us about the fifth-wheel trailer as defense was talking about. The bathroom being - - marijuana being transported in that and

-15-

they would pile it all the way to the ceiling inside the bathroom in the Coachmen trailer.

The next morning, however, the trial court reconsidered its ruling. Following argument by both sides, the trial court sustained the Defendant's earlier objection and issued the following curative instruction to the jury:

> Good morning, Ladies and Gentlemen. Members of the Jury, yesterday toward the close of the day you heard some testimony from Officer Buck about some information he received from an informant related to the Defendant, Mr. Vukelich. I want you to disregard that testimony. Do not consider that testimony for any purpose whatsoever in this lawsuit. Thank you.

First, we agree with the Defendant that Officer Buck's statement was inadmissible hearsay, because it was an out-of-court statement made by the confidential informant and offered to prove the truth of the matter asserted in the statement, i.e., that the Defendant was involved in the drug-dealing organization. See Tenn. R. Evid. 801. The State claims that the statement was merely offered to show that the informant made the statement, i.e., that besides Rippy and Corn, the informant had also implicated the Defendant. However, if the statement were merely offered to show that the informant had implicated the Defendant, but not to show that the Defendant was guilty, then the statement would have little to no relevance and a substantial danger of unfair prejudice. See Tenn. R. Evid. 401, 403.

We also agree that admission of the statement violated the Defendant's right to confront witnesses. It is well-settled that the Confrontation Clause of the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution provide two protections for criminal defendants: the right to physically face witnesses and the right to cross-examine witnesses. See Pennsylvania v. Ritchie, 480 U.S. 39, 51, 107 S. Ct. 989, 998, 94 L. Ed. 2d 40, 53 (1987); see also State v. Middlebrooks, 840 S.W.2d 317, 332 (Tenn. 1992). In State v. Henderson, our supreme court recognized that in order to satisfy federal constitutional confrontation rights:

> (1) the evidence must not be "crucial" or "devastating" (but see State v. Dwight Miller 1998 WL 902592 *6, questioning whether this prong still viable)

> (2) there is proof that the witness is unavailable, i.e., the State must make a good faith effort to secure the presence of the person whose statement is to be offered against the defendant; and

> (3) the evidence offered under a hearsay exception must bear its own 'indicia of reliability.'

554 S.W.2d 117, 120 (Tenn. 1977) (citations omitted). Similarly, in Ohio v. Roberts, the United States Supreme Court analyzed the relationship between the Confrontation Clause and the hearsay rules of evidence and established the following general approach: "[W]hen a hearsay declarant is not

present for cross-examination at trial . . . his statement is admissible only if it bears adequate 'indicia of reliability.' " Ohio v. Roberts, 448 U.S. 56, 56, 100 S. Ct. 2531, 2538, 65 L. Ed. 2d 597 (1980). The Roberts Court also held that "the Confrontation Clause . . . requires a showing that [a hearsay declarant] is unavailable." Roberts, 448 U.S. at 75. The Court later modified the unavailability requirement in White v. Illinois,: "[U]navailability analysis is a necessary part of the Confrontation Clause inquiry only when the challenged out-of-court statements were made in the course of a prior judicial proceeding . . . ." 502 U.S. 346, 354-55, 112 S. Ct. 736, 116 L. Ed. 2d 848 (1992); see also State v. Kennedy, 7 S.W.3d 58, 65 (Tenn. Crim. App. 1999). However, we need not decide whether the second prong of Henderson's tripartite test has been modified by the United States Supreme Court's holding in White, nor must we decide whether the evidence was crucial or devastating, because we hold that the statement made by a confidential informant and relayed by a police officer was not admissible under any hearsay exception and, in any event, lacked its own indicia of reliability. Thus, the Defendant's confrontation rights were violated.

In reviewing an error of constitutional magnitude, we must determine whether the error was harmless beyond a reasonable doubt. Chapman v. California, 386 U.S. 18, 24, 87 S. Ct. 824, 828, 17 L. Ed. 2d 705 (1967); Momon v. State, 18 S.W.3d 152, 167 (Tenn. 1999); State v. Deuter, 839 S.W.2d 391, 396-97 (Tenn. 1992). We conclude that the trial court's erroneous admission of Officer Buck's testimony about the confidential informant was harmless beyond a reasonable doubt, because (1) the evidence of the Defendant's guilt was substantial; (2) the hearsay itself did not provide any additional information that the jury had not already heard; and (3) the trial court, after recognizing its error, instructed the jury to disregard the testimony.

Although the Defendant relies on State v. Brown, 915 S.W.2d 3 (Tenn. Crim. App. 1995), we find that case distinguishable from the case *sub judice*. In Brown, a detective testified that a confidential informant told the detective that the defendant was driving a certain make of car and was carrying drugs. Id. at 5. The detective stopped the car and attempted to secure the defendant, who was driving the car. Id. As he did so, he saw the passenger throw two bags of cocaine away from the vehicle. Id. The trial court allowed the detective to testify about the confidential informant's statement. Id. at 6. On appeal, this Court found that the admission of the detective's testimony was erroneous, because the danger of unfair prejudice substantially outweighed its probative value. Id. at 7. The Court also found that the error was not harmless, because there was very little evidence tying the defendant to the discarded cocaine. Id.

In this case, however, there was substantial evidence of the Defendant's guilt. Although most of the evidence of the Defendant's guilt was established through the testimony of accomplices, that testimony was substantial and corroborated. Mr. Rippy, Mr. Corn, and Mr. McCool all testified that they delivered drugs and/or money for the Defendant and that they engaged in various schemes to hide their involvement and launder the money, including the purchase of vehicles and a trailer to transport the drugs and a truck-bed liner to hide the drugs, all at the Defendant's direction. Several witnesses verified that the Defendant kept a trailer and possessed a gold truck, and telephone records verified that the Defendant called Mr. Rippy and Mr. McCool several times. Finally, Bob Williams and Keith Schumacher both testified that they helped the Defendant launder money.

Furthermore, in determining whether the error was harmless, it is useful to determine whether the challenged evidence provided new or merely cumulative evidence. Of course, in some cases, evidence that is cumulative may be quite harmful, as it may serve to corroborate evidence that was

previously dubious. However, in this case, Officer Buck's brief testimony about the confidential informant's tip was of little consequence given the nature and weight of all of the other evidence.

Finally, we note that the trial court did instruct the jury to disregard the erroneously admitted testimony. The jury is presumed to have followed the trial court's instruction. State v. Smith, 893 S.W.2d 908, 923 (Tenn.1994). In view of all of the above, we find that the error in the admission of this testimony was harmless beyond a reasonable doubt.

### Mistrial

Next, the Defendant claims that the trial court erred by twice refusing to grant a mistrial. The Defendant first moved the court to declare a mistrial after the introduction of Officer Buck's testimony discussed above and again when the prosecutor elicited testimony that the Defendant had smoked marijuana with a witness for the State.

During the first trial, the prosecutor elicited testimony from Keith Schumacher that he had previously smoked marijuana with the Defendant on two occasions. The Defendant objected, and, following a hearing, the court sustained the objection. Nevertheless, in the second trial, the following colloquy occurred:

> MR. ZIMMERMAN: And you talked about the closeness of your relationship. At any time did you ever use drugs in the presence of [the Defendant]?
>
> MR. SCHUMACHER: On two occasions I smoked a joint with [the Defendant]. Once at his home on July 4th with Joe Prim and another time at my place we did. But I'm not a pot smoker and that's the only two times I ever seen him [sic].

The court immediately asked for a bench conference and excused the jury. The prosecutor apologized and claimed to have forgotten the trial court's earlier ruling, and the trial court strongly admonished the prosecutor. The Defendant then moved for a mistrial, but the trial court denied the motion:

> THE COURT: I think I indicated the last time that, I mean, I really didn't think the issue was that important because I don't believe that a jury is going to convict someone for drug trafficking or money laundering because they smoked marijuana a couple of times. On the other hand, there was sort of a basis for my ruling that because someone smoked marijuana is really not probative of whether they were involved in selling. So motion for mistrial is overruled. You could never convince me that a jury is going to convict somebody because they smoked marijuana a couple of times.

At the Defendant's request, the trial court then instructed the jury to disregard the testimony. On appeal, the Defendant claims that a mistrial was warranted by the confrontation violation "because a mistrial was the only measure which could rectify such an injustice of constitutional proportions." He also claims that a mistrial was necessary after Mr. Schumacher's testimony because (1) Mr.

-18-

Schumacher's testimony itself was inherently prejudicial, and (2) the prosecutor flagrantly disregarded the trial court's ruling. We disagree.

The purpose of a mistrial is to correct the damage done to the judicial process when some event has occurred that would preclude an impartial verdict. Arnold v. State, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). The decision whether to grant a mistrial is within the trial court's discretion and will not be disturbed absent an abuse of that discretion. State v. McPherson, 882 S.W.2d 365, 370 (Tenn. Crim. App. 1994). "Generally a mistrial will be declared in a criminal case only when there is a 'manifest necessity' requiring such by the trial judge." State v. Millbrooks, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991).

In this case, we find that the trial court did not abuse its discretion by refusing to grant a mistrial, because, in both instances, the offending testimony was limited, and the trial court took immediate steps to prevent undue prejudice to the defendant. See State v. Adkins, 786 S.W.2d 642, 644 (Tenn. 1990) (holding that a mistrial was not required following a witness's outburst where the trial court took immediate action to dispel prejudice); see also State v. Mathis, 969 S.W.2d 418, 422 (Tenn. Crim. App. 1997) (holding that "[i]n light of the limited nature of the offending testimony and the trial court's prompt curative instruction, the trial court did not abuse its discretion in refusing to grant a mistrial").

With respect to the argument that the flagrancy of the prosecutor's disobedience to the trial court's ruling warrant a mistrial, we note that the test to be applied in reviewing a claim of prosecutorial misconduct is "whether the improper conduct could have affected the verdict to the prejudice of the defendant." Harrington v. State, 385 S.W.2d 758, 759 (Tenn. 1965). The factors to be considered in such an analysis, set out in Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976), and adopted by the Tennessee Supreme Court in State v. Buck, 670 S.W.2d 600, 609 (Tenn. 1984), are as follows:

(1) the conduct complained of, viewed in light of the facts and circumstances of the case;

(2) the curative measures undertaken by the court and the prosecution;

(3) the intent of the prosecutor in making the improper statement;

(4) the cumulative effect of the improper conduct and any other errors in the record; and

(5) the relative strength or weakness of the case.

Judge, 539 S.W.2d at 344.

The first factor, the conduct complained of, weighs in favor of the Defendant, because the testimony solicited was patently improper given the trial court's previous ruling. The second factor, the curative measures undertaken by the court and the prosecution, weighs in favor of the State, because the Court immediately issued curative instructions. The third factor, the intent of the prosecutor, does not weigh either way, because the only evidence of the prosecutor's intent is his apology to the court and his explanation that he did not remember the trial court's ruling in the

original trial. The weight of the fourth factor is also neutral, because although there was another error in the trial, the cumulative effect did little to alleviate the effect of this error. The final factor, the strength of the case, tips the scales in favor of the State because the evidence of the Defendant's guilt was substantial. In short, we are convinced that any improper conduct on the prosecutor's part did not contribute to the guilty verdict. This issue does not require a reversal of the case.

## Prior Acts

Next, the Defendant complains that the trial court erred by allowing the State to introduce evidence that the Defendant had entered into a lease with Gary Jones. Prior to trial, the Defendant moved the court to exclude all evidence of the conspiracy that predated November, 1989, pursuant to rule 404(b) of the Tennessee Rules of Evidence. The trial court granted the Defendant's motion. However, during the trial, the court allowed the State to introduce a copy of a lease from Arizona that showed that the Defendant and Gary Jones had leased a condominium in Arizona from November, 1988 to May, 1989. On appeal, the Defendant claims that introduction of this lease violated Rule 404(b) of the Tennessee Rules of Evidence. We disagree.

Rule 404(b) provides as follows:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence; and

(3) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). Furthermore, before admitting any evidence of prior acts under Rule 404(b), a trial court must find by clear and convincing evidence that the defendant committed the other acts. Tenn. R. Evid. 404, Advisory Commission Comments; State v. Parton, 694 S.W.2d 299, 303 (Tenn. 1985).

Although the Defendant correctly notes that the rule applies to prior acts, not merely prior crimes, the rule only excludes propensity evidence, i.e., evidence "that prove[s] the character of a person in order to show action in conformity with the character trait." Tenn. R. Evid. 404(b). As the Tennessee Supreme Court has noted,

Where the evidence of other crimes, wrongs, and acts may reflect upon the character of the accused, the procedure set forth in Rule 404(b) should be followed, even though the evidence is offered to prove a material fact not necessarily related directly

-20-

to the accused. If, after hearing the evidence, the trial court finds that the evidence does not implicate the accused, the weighing of probative value against unfair prejudice will be made pursuant to Rule 403. If the court finds that the evidence reflects upon the character of the accused, the weighing will be made pursuant to Rule 404(b).

State v. DuBose, 953 S.W.2d 649, 655 (Tenn. 1997). In other words, if the State had been trying to establish the Defendant's propensity for entering into leases, Rule 404(b) might apply. However, in this case, the State was merely attempting to prove that the Defendant and Gary Jones knew each other, and evidence of the Arizona lease was relevant to establish that. It did not, however, implicate the Defendant's character. See id.; see also State v. Lacy, 983 S.W.2d 686 (Tenn. Crim. App. 1997). Thus, the trial court did not abuse its discretion. This issue is without merit.

## Sentencing

Finally, the Defendant challenges the sentence imposed by the trial court. Following a sentencing hearing, the trial court sentenced the Defendant to serve twenty years for count one, conspiracy to deliver over 700 pounds of marijuana; four years each for counts three and four, conspiracy to commit money laundering; and ten years each for counts five, six, seven, eight and nine, all money laundering. The court also ordered the sentences for counts three and four to be served concurrently to each other, but consecutively to the sentence for count one, and the sentences for the remaining counts to be served concurrently to each other but consecutive to counts one and three, for a total effective sentence of thirty-four years. The court also imposed a total of $180,000.00 in fines on the Defendant. On appeal, the Defendant claims that the trial court erroneously (1) enhanced the length of the Defendant's sentence, (2) imposed consecutive sentences, and (3) imposed excessive fines.

## A. Standard of Review

This Court's review of the sentence imposed by the trial court is de novo with a presumption of correctness. Tenn. Code Ann. § 40-35-401(d). However, this presumption is conditioned upon an affirmative showing in the record that the trial judge considered the sentencing principles and all relevant facts and circumstances. State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). If the trial court fails to comply with the statutory directives, there is no presumption of correctness, and our review is de novo. State v. Poole, 945 S.W.2d 93, 95 (Tenn. 1997). In conducting a de novo review, we must consider (1) the evidence, if any, received at the trial and sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct; (5) any mitigating or statutory enhancement factors; (6) any statement that the defendant made on his own behalf; and (7) the potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-103, -210; Ashby, 823 S.W.2d at 168.

## B. Length of Sentence

The Defendant challenges the length of his sentence. In this case, the trial court found the existence of two statutory enhancing factors: (1) that the Defendant had a previous history of criminal convictions or criminal behavior in addition to that necessary to establish the appropriate sentencing range and (2) that the Defendant was the leader in the commission of the offenses. Tenn. Code Ann. § 40-35-114(1) & (2). The trial court also found the existence of three mitigating factors: (1) that the Defendant's conduct neither caused nor threatened serious bodily injury; (2) that the Defendant expressed remorse; and (3) that the Defendant ran a successful business. Id. § 40-35-113(1), (13).

First, the Defendant claims that the trial court erroneously applied the first enhancement factor, because the "previous history of criminal behavior" was originally charged as part of the offense. As noted above, the state originally tried to charge the pre-1989 conduct in the first two indictments, but was prevented from doing so for various reasons. However, the State did present evidence of this pre-1989 conduct at the sentencing hearing. Specifically, Randy McCool testified that he made numerous trips to deliver marijuana for the Defendant prior to the charged conspiracy. Furthermore, Sergeant James McWright testified that a search of the Defendant's home prior to the charged conspiracy yielded marijuana, paraphernalia and a large amount of cash.

The Tennessee Supreme Court has noted that

> As we have previously observed, enhancement factors must be 'appropriate for the offense' and 'not themselves essential elements of the offense.' These limitations exclude enhancement factors 'based on facts which are used to prove the offense' or '[f]acts which establish the elements of the offense charged.' The purpose of the limitations is to avoid enhancing the length of sentences based on factors the Legislature took into consideration when establishing the range of punishment for the offense.

Poole, 945 S.W.2d at 98 (citations omitted). The evidence adduced at the sentencing hearing was not an essential element of the offense, because it occurred prior to the charged conspiracy. Furthermore, the evidence was sufficient to establish the previous history of criminal behavior. Thus, the trial court did not err in applying the enhancement factor.

The Defendant also challenges the weight that the trial court assigned to the aggravating factors and mitigating factors. As a Range I, Standard Offender, the Defendant was eligible for a sentence between fifteen and twenty-five years for count one, a Class A felony; between three and six years each for counts three and four, Class C felonies; and between eight and twelve years each for counts five, six, seven, eight and nine, Class B felonies. Tenn. Code Ann. § 40-35-111. The presumptive sentence for each offense was the minimum sentence in the range. Id. § 40-35-210(c)(1990).[3] If enhancement and mitigating factors do exist, a trial court should start at the

---

[3]Although after 1998, the legislature amended section 40-35-210(e) so that when enhancing factors and mitigating factors were present, the presumptive sentence for Class A felonies is the midpoint, not the minimum, within

(continued...)

presumptive sentence, enhance the sentence within the range for enhancement factors and then reduce the sentence within the range for the mitigating factors. Id. § 40-35-210(e).

Although the defendant argues that the trial court failed to follow the prescribed "statutory calculus" in determining the weight applied to each factor, it is well-settled that no particular weight for each factor is prescribed by the statute, as the weight given to each factor is left to the discretion of the trial court, provided that its findings are supported by the record. See State v. Santiago, 914 S.W.2d 116, 125 (Tenn. Crim. App. 1995); see also Tenn. Code Ann. § 40-35-210, Sentencing Commission Comments. We find that the record supports the defendant's sentences.

### C. Consecutive Sentences

Next, the Defendant challenges the imposition of consecutive sentences. A trial court may impose consecutive sentencing upon a determination that one or more of the criteria set forth in Tennessee Code Annotated Section 40-35-115(b) exists. This section permits the trial court to impose consecutive sentences if the court finds, among other criteria, that the defendant is a professional criminal who has knowingly devoted himself to criminal acts as a major source of his livelihood. Tenn. Code Ann. § 40-35-115(b)(1). The trial court found that the Defendant was a professional criminal and accordingly ordered consecutive sentencing.

The Defendant argues (1) that the trial court erred in relying on pre-November 1, 1989 conduct to establish that the Defendant was a professional criminal and (2) that the trial court ignored the sentencing considerations delineated in Tennessee Code Annotated Section 40-35-103 in imposing consecutive sentences. We disagree.

We need not decide whether the trial court could have relied on pre-November 1, 1989 conduct in finding that the Defendant was a professional criminal, because the record indicates that the trial court did not rely on that evidence in making its finding. In imposing consecutive sentences, the court held as follows: "[a]s far as the consecutive sentencing under 40-35-115, I think [the Defendant] is a professional criminal. He at least earned part of his livelihood from his involvement in a marijuana business that at least went from 1989 to 1996." This does not indicate, as the Defendant suggests, that the court relied on pre-November 1, 1989 conduct in imposing consecutive sentences. Furthermore, the record indicates that the Defendant was a major marijuana dealer for at least the past several years and that he used the proceeds of his illegal enterprise to purchase a house and a boat and to partially finance his legitimate business. Indeed, the Defendant admitted to dealing drugs at the sentencing hearing. We find the evidence sufficient to support a finding that the Defendant was a professional criminal.

The Defendant also argues that the trial court erroneously ordered consecutive sentences without first taking into account the sentencing considerations embodied in Tennessee Code Annotated section 40-35-103. Specifically, he claims that "the trial court should have considered (1) the need to protect the public from further serious criminal offenses by the Defendant; (2)

---

[3](...continued)

the range, the conspiracy to deliver over 700 pounds of marijuana in this case occurred prior to the amendment. Thus, the correct presumptive sentence in this case, and the one applied by the trial court, was the minimum sentence within the range.

inequality in sentencing; (3) the least severe measure of punishment; and (4) the Defendant's potential for rehabilitation. With regard to the claims that the terms of the Defendant's sentence do not reasonable relate to the severity of the offenses and that consecutive sentences were not necessary to protect the public from further serious criminal conduct, see State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995), the Tennessee Supreme Court has held that the Wilkerson factors are limited to cases involving defendants found to be "dangerous offenders" under Tennessee Code Annotated section 40-35-115(b)(4). State v. Lane, 3 S.W.3d 456, 461 (Tenn. 1999). Thus, this claim is without merit.

The Defendant also contends that his situation is analogous to that of the defendant in State v. Desirey, 909 S.W.2d 20 (Tenn. Crim. App. 1995). In Desirey, this court ruled that trial courts should ensure that the aggregate sentence imposed should be the least severe measure necessary to protect the public from the defendant's future criminal conduct and should bear some relationship to the defendant's potential for rehabilitation. Id. at 33. Desirey was convicted of four counts of bribing a public servant and was sentenced to four consecutive four-year, six-month sentences. Id. at 34. On appeal, this court modified the sentences so that three of the terms were concurrent, resulting in an aggregate nine-year sentence. Id. The court held that four consecutive sentences were inappropriate because the defendant had been convicted of non-violent offenses that "consisted of a short series of similar, related conduct of an ongoing nature." Id. The court commented that "offenses which overlap with the same intent can make concurrent sentencing appropriate." Id. (citing State v. Holt, 691 S.W.2d 520, 522 (Tenn. 1984)).

Although the Defendant, like Desirey, did commit non-violent offenses that consisted of an ongoing series of related conduct, there are significant differences between this Defendant and Desirey. First, the offenses in Desirey all occurred within a much briefer time span, specifically all within one month. Second, the proof established that Desirey possessed significant potential for rehabilitation. This defendant can be distinguished from Desirey in both respects because he continued to violate the law despite a nearly decade-long investigation, and all of the offenses at issue occurred within the much longer time-span of six years. In short, considering the Defendant's potential for rehabilitation and the nature of the offenses, we find the Defendant's case sufficiently distinguishable from Desirey. We hold that the aggregate thirty-four year sentence imposed on the Defendant was appropriate.

## D. Excessive Fines

Besides the sentence of incarceration, the trial court also imposed an aggregate fine of $180,000 on the Defendant.[4] The Defendant does not challenge the amount of the fines per se; instead, he claims that the amount of the fines in conjunction with the amount of property forfeited violates the Excessive Fines Clauses of the Tennessee and United States Constitutions. In support of his argument, the Defendant cites Stuart v. State, 963 S.W.2d 28, 34 (Tenn. 1998). In Stuart, the Tennessee Supreme Court held that while forfeiture of the *proceeds* of illegal drug transactions are

---

[4]The fines assessed were as follows: $150,000 for count one; $2,500 each for counts three and four; and $5000 each for counts five, six, seven, eight and nine, originally totalling $180,000. The fines were reduced to $160,000 when the trial court subsequently dismissed the four "Schumaker counts" of money laundering.

not punitive and are therefore not subject to excessive fines analysis, forfeiture of *items* used in furtherance of an illegal drug transaction is punitive in nature and therefore subject to excessive fines analysis. Id. at 34-35. The supreme court then articulated a five-pronged proportionality test to determine whether the forfeiture of an item used in furtherance of a drug transaction constitutes an excessive fine.

However, at the time the Defendant filed his brief, the forfeiture proceedings were still pending, and the Defendant "concedes that it is difficult to assess whether the trial court's fine [] was excessive in light of the absence of a Judgment of Forfeiture." We agree. When imposing fines, a trial court must examine "the defendant's ability to pay that fine, and other factors of judgment involved in setting the total sentence." State v. Bryant, 805 S.W.2d 762, 766 (Tenn. 1991). Thus, although the defendant's ability to pay a fine is a factor, it is not necessarily a controlling one. See State v. Marshall, 870 S.W.2d 532, 542 (Tenn. Crim. App. 1993) overruled on other grounds by State v. Carter, 988 S.W.2d 145 (Tenn.1999).

Although Stuart established a test to determine whether a forfeiture constituted an excessive fine, it did not change the well-settled principles that guide our analysis regarding whether a fine itself is excessive, nor did it mandate that we determine whether a combination of forfeitures and fines are excessive, except to the extent that those forfeitures would impact the Defendant's ability to pay the fines. In this case, the trial court did not state its findings on the record regarding the calculation of the fines. However, given the seriousness and nature of the crimes, we defer to the trial court's judgment regarding the amount of the fines. See id. We also note that although the fine imposed was $180,000, the Defendant faced a maximum possible aggregate fine of $645,000.[5] This issue is without merit.

### Conclusion

Accordingly, the judgment of the trial court is AFFIRMED in part and REVERSED in part, and the case is remanded to the trial court for sentencing on the four (4) money laundering counts reinstated by this Court.

JERRY L. SMITH, JUDGE

---

[5]Tennessee Code Annotated section 39-17-417(j) authorizes up to $500,000 for conspiracy to deliver over 700 pounds of marijuana. Tennessee Code Annotated Sections 40-35-111(b)(2), (3) authorize a maximum of $10,000 for each count of conspiracy to commit money laundering and a maximum of $25,000 for each count of money laundering.